237 F.2d 79
 60 A.L.R.2d 1119
 DeLancey C. SMITH, Plaintiff-Appellant,
v.
Joseph Ainslie BEAR, Harold C. Mayer, V. Theodore Low, Salim
L. Lewis, David Finkle, Donald C. Lillis, Leonard Dickson
and Robert B. Stearns, individually and as co-partners doing
business under the firm name and style of Bear, Stearns &
Co., Defendants-Appellees.
 No. 225, Docket 23863.
 United States Court of Appeals Second Circuit.
 Argued Jan. 16, 17, 1956.
Decided Sept. 4, 1956.
 
 Hale, Stimson, Russell & Nickerson, New York City (Eugene H. Nickerson, Henry I. Stimson, Lawrence L. Stentzel, II, New York City, of counsel), for plaintiff-appellant.
 Winthrop, Stimson, Putnam & Roberts, New York City (Allen T. Klots, Merrell E. Clark, Jr., New York City, of counsel), for defendants-appellees.
 Before MEDINA, HINCKS and WATERMAN, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 The action here was brought on January 10, 1950 in the U.S. District Court for the Southern District of New York, by DeLancey C. Smith, a resident of California, against eight defendants, as individuals and as co-partners of the New York City brokerage firm of Bear, Stearns & Co. Smith sued as assignee of the claims of F. E. Hesthal Co., Inc., a California corporation of which he was president, and as assignee of the claims of one Curtis Day, also a resident of California. The complaint seeks damages on four causes of action: two for breach of alleged oral contracts, and two for alleged breach of duties owed plaintiff's assignors under the federal securities laws.
 
 
 2
 In the first two causes of action, plaintiff alleged and sought to prove that, in January 1946, defendant Bear, Stearns & Co. through Livingstone & Co., a California corporation in the general investment business, with offices in San Francisco and Los Angeles, entered into certain oral agreements with each of plaintiff's assignors. The third and fourth causes of action arose out of the same transactions as the first two.
 
 
 3
 The case was tried to a jury which returned a special verdict in favor of the defendants upon written questions submitted to it by the trial judge. From a judgment entered on the verdict for the defendant, plaintiff appeals alleging various errors were committed to his prejudice during the trial. Upon the view we take of this case, it will be necessary for us to consider only two of these alleged errors. (1) As to the first and second causes of action, plaintiff took exception to the trial court's charge instructing the jury to disregard any evidence of the alleged oral contracts. The trial court ruled as a matter of law that these alleged oral contracts were inconsistent with written agreements entered into with Livingstone & Co. by plaintiff's assignors. (2) As to the third and fourth causes of action, plaintiff took exception to the trial court's exclusion from evidence of certain memoranda supposedly bearing on the question whether Bear, Stearns & Co. induced ceratin wrongful acts of Livingstone & Co.
 
 
 4
 At all times material to this controlversy plaintiff's assignors dealt with Livingstone & Co., and at no time did they ever deal directly with Bear, Stearns & Co. Livingsteone & Co. was a newly formed corporation in the general investment business in California. The president of Livingstone & Co. was a close friend of several of the partners of Bear, Stearns & Co. and two-thirds of the capital for Livingstone & Co. was provided by the wives and relatives of the partners of Bear, Stearns & Co. Bear, Stearns & Co. maintained and paid for a direct wire from their offices in New York City to Livingstone & Co.'s offices in San Francisco. On the other hand there was uncontradicted testimony that neither the partners of Bear, Stearns & Co. nor their wives and relatives ever interfered with the management of Livingstone & Co.; that on the contrary, the management of Livingstone & Co. was exclusively in the hands of its president, Livingstone, and that Bear, Stearns & Co. customarily paid for direct wires to its out-of-town correspondents.
 
 
 5
 Plaintiff claimed that under alleged oral agreements with defendants, plaintiff's assignors bought and sold securities in so-called arbitrage transactions. These arbitrages involved the purchase on the one hand of certain bonds (hereinafter called the 'old bonds') of the St. Louis-San Francisco Railway Co., then in re-organization, and the simultaneous short sale at a price greater than the purchase price of the 'old bonds' of the securities (hereinafter called the 'when issued securities') which would be received when the re-organization was consummated. The difference in the purchase price of the old bonds and the sales price of the when issued securities was 'locked-in profit.' The only way plaintiff's assignors believed they could lose on the transaction would be if the re-organization should fail to go through as planned. Livingstone, the president of Livingstone & Co., orally agreed, according to plaintiff's version of the case, that plaintiff's assignors need pay only 20 per cent of the cost of the old bonds; that Livingstone & Co. would finance the balance of the purchase price at 1 per cent interest; and that plaintiff's assignors would never be required to pay anything more toward their purchase price.
 
 
 6
 The alleged oral agreements were inconsistent with the express terms of written agreements signed by plaintiff's assignors at the time they entered into the transactions. In these agreements plaintiff's assignors promised that if Livingstone & Co. should demand more margin on the old bonds in the further, funds would be furnished as required.
 
 
 7
 After the 20 per cent of cost was put up and the bonds were purchased, their market price fell; and Livingstone & Co., under pressure from the Bank of Manahattan with which it had financed the transactions, demanded more margin from time to time from its customers as the market prices continued to fall. At first, both Hesthal & Co. and Day met these demands for additional margin and did so without filing any written protests. Eventually, Day, unable to meet the increased margin requirements, was sold out at a direct loss to him of $44,476.88. He alos failed to realize an expected profit of $33,357.79. Hesthal & Co., however, in September, 1946 undid the arbitrage. It borrowed funds for this purpose from the Guaranty Trust Co. of New York City, and thus met the balance due on the cost price of the old bonds, and covered the short sale of the when issued securities. It held the old bonds until the reorganization actually took place as planned in January, 1947. The old bonds continued to fall in price. Finally Hesthal & Co. suffered a net loss on its investment of $71,872.09 plus $4,800.55 interest paid on the Guaranty Trust loan, Hesthal also failed to realize an expected profit on the arbitrage transaction, which in its case would have been $44,239.22. It is for the foregoing alleged damages that plaintiff brings this suit.
 
 
 8
 The trial court instructed the jury with reference to the law applicable to the first two causes of action based upon the alleged oral agreements:
 
 
 9
 'It is the duty of the judge to interpret the meaning of a written instrument. I instruct you as a matter of law that the written agreements entered into between Livingstone & Co. and Hesthal & Co. and Day, respectively, were agreements that if Livingstone & Co. required further payments to be made to secure the balance due on the purchase of the securities, Livingstone & Co. had a right to demand such payments and Hesthal & Co. and Day, respectively, had an obligation to make them, and in the event that they were not made, Livingstone & Co. had a legal right to seel out the securities then standing in the account of these customers. We thus have causes of action based upon alleged oral agreements which are inconsistent with the written agreements. * * *
 
 
 10
 'If they (the oral agreements) were firm contracts that no more than 20 per cent margin would ever be required, then when thereafter or simultaneously therewith Smith and Day entered into written agreements recognizing that Livingstone & Co. could call for more margin, the oral contracts were no longer binding. The written contracts would supersede the oral statements. * * * As a matter of law, the written agreement providing that Livingstone & Co. could call for more margin supersedes all negotiations or oral stipulations concerning this matter which preceded or accompanied the execution of this written agreement, and the written agreement to the extent that it is contradictory of the oral statements made before or at the time of the execution of this written agreement, supersedes all of the oral statements.'[1]
 
 
 11
 The trial court thus invoked the so-called parol evidence rule. This rule is actually not a rule of evidence, but a rule of substantive law. In re Gaines' Estate, 1940, 15 Cal.2d 255, 100 P.2d 1055; Higgs v. De Maziroff, 1934, 263 N.Y. 473, 189 N.E. 555, 92 A.L.R. 807. Both parties therefore correctly concede that California law is controlling. Wootton Hotel v. Northern Assurance Co., 3 Cir., 1945, 155 F.2d 988.
 
 
 12
 Under California law,[2] in the absence of fraud, mistake or accident, clear and unambiguous words of a written agreement cannot be varied by oral testimony. California Canning Peach Growers v. Williams, 1938, 11 Cal.2d 221, 78 P.2d 1154; Parker v. Meneley, 1951, 106 Cal.App.2d 391, 235 P.2d 101. Contemporaneous or prior oral negotiations are regarded as merged into the writing and cannot very or contradict the terms of the written agreement. Hale v. Bohannon, 38 Cal.2d 458, 241 P.2d 4; Wenban Estate, Inc., v. Hewlett, 1924, 193 Cal. 675, 227 P. 723. See Wigmore, Evidence (3rd ed. 1940), § 2425. Therefore, 'Such (oral or extrinsic) evidence, though admitted without objection must be ignored as of no legal import and its incompetency to very a written contract is a matter of law.' Lifton v. Harshman, 1947, 80 Cal.App.2d 422, 433, 182 P.2d 222, 228.
 
 
 13
 The written agreements signed by plaintiff's assignors were of the type that customers normally sign with brokers. The written agreements with each of plaintiff's assignors were identical and provided in part that 'the customer agrees upon demand, to deposit any additional margin required by the broker, and in case of his failure to do so * * * the broker shall have the right to close the account * * * or to sell any securities therein * * *'
 
 
 14
 When more margin was required, it was on the basis of these agreements that Livingstone & Co. demanded more margin; plaintiff's assignors acquiesced in the demands and paid more margin from time to time; and Livingstone & Co. finally sold out Day when he failed to meet the demands for additional margin.
 
 
 15
 Plaintiff attacks the applicability of the parol evidence rule to these agreements on no less than four grounds. He contends that the jury should have been allowed to consider the evidence of the alleged oral agreements because: (1) the written agreements were ambiguous; (2) the written agreements were not sufficiently integrated to invoke the rule; (3) the written agreements were intended by the parties to be of no binding effect; (4) the written agreements through mutual mistake failed to express the real intention of the parties. Additionally, plaintiff contends that in the case of Day, the written agreement was varied by a subsequent oral agreement and that the trial court erred in refusing to instruct the jury that the written agreement could be so varied.
 
 
 16
 In accordance with the discussion below, we refect each of plaintiff's contentions and hold that the trial court correctly applied California law in instructing the jury to disregard the alleged oral agreements.
 
 
 17
 The contention that the written agreements were ambiguous. Plaintiff contends that in the setting of this case the written agreements were ambiguous, biguous, and that therefore the jury should have been allowed to consider extrinsic evidence explaining the purported ambiguity. The trial judge ruled as a matter of law that there was no ambiguity. He told the jury:
 
 
 18
 'Both Mr. Smith (who acted on behalf of Hesthal & Co.) and Mr. Day were experienced businessmen; both of them had securities transactions with brokers; both of them understood what margin meant; both of them recognized that in buying these securities and entering into this arbitrage transaction, they had made part payment on account and that the balance was loaned to them and the loan was secured by the securities which they had bought or contracted to sell.'
 
 
 19
 He then instructed them to disregard the extrinsic evidence inconsistent with the written agreements. We think that the trial judge was entirely correct. The parol evidence rule is strictly adhered to in California. Gandelman v. Mercantile Ins. Co. of American, 9 Cir., 1951, 187 F.2d 654, 658. Only last year a California court held: 'The evidence showed conduct on both sides which would amount to a practical construction of the contract in harmony with defendants' contention were it not for the fact that practical construction has no place in the consideration of an unambiguous agreement.' Petersen v. Ridenour, 1955, 135 Cal.App.2d 720, 725, 287 P.2d 848, 850.
 
 
 20
 In its disposition of the parol evidence question, the trial court followed exactly the procedure described as proper by the 9th Circuit, the federal appellate court most experienced in dealing with California law. In Black v. Richfield Oil Corp., 9 Cir., 1944, 146 F.2d 801, at page 804 the court said:
 
 
 21
 'One would expect to find, and there are to be found in the California decisions, cases holding rather broadly that in resolving questions of intent it is the duty of the court to admit parol evidence of the surrounding circumstances in order that the court may place itself in the same situation as the contracting parties were; but in the same cases it is recognized that the language of the (written) contract must govern its interpretation.'
 
 
 22
 The contention that the written agreements were not sufficiently integrated to invoke the parol evidence Plaintiff also contended that merely because the writings here did not contain the entire contracts between the parties the parol evidence rule should not be invoked. On this point also the trial court's ruling to the contrary was correct. Under California law, where there is a written integration of part of the terms of a contract, contemporaneous and prior oral agreements are operative to vary these terms only to the same extent as if the whole contract had been integrated. Pierce v. Edwards, 1907, 150 Cal. 650, 89 P. 600; Keeler v. Murphy, 1931, 117 Cal.App. 386, 387, 2 P.2d 950; Restatement of Contracts, Sec. 239.[3]
 
 
 23
 The contention that the written agreements were not intended to be binding. As a third alternative Plaintiff suggests that the written agreements should have been disregarded because the parties had agreed that they were not to be binding. It is the law in California that parol evidence is admissible to show that the parties agreed that the writing executed by them was a sham or artifice or was otherwise of no binding effect. P. A. Smith Co. v. Muller, 1927, 201 Cal. 219, 256 P. 411; Monica v. Pelicas, 1955, 131 Cal.App.2d 700, 281 P.2d 269.
 
 
 24
 To show that a written document was not intended to be binding, i.e., that it was not intended to be what it purports to be, it is not enough to rely solely on an inconsistent oral agreement. Parker v. Meneley, 1951, 106 Cal.App.2d 391, 235 P.2d 101. In the Parker case, after noting that 'parol evidence is admissible to show that the writing was sham or artifice,' the court went on to say:
 
 
 25
 'Such evidence is not considered as varying the terms of a written instrument, but as negating its very existence. The parol evidence offered here simply contradicted the terms of the written instrument. It did not tend to show in any way that the parties executed the contract for some extrinsic purpose, such as sham or artifice, or that it was intended for some purpose other than to set forth their respective rights and obligations.' 106 Cal.App.2d at pages 401, 402, 235 P.2d at pages 106, 107.
 
 
 26
 The situation described in that case is similar to the case at bar. There is not sufficient evidence here to support a finding that the parties intended the written agreements to be of no binding effect. The conduct of the parties subsequently in carrying out the terms of the written agreement and other circumstances in evidence directly contradict the contention that the parties did not intend the written agreements to be binding.
 
 
 27
 The contention that the written agreements through mutual mistake failed to express the real intention of the parties. Plaintiff contends that any inconsistency between the written agreements and the alleged oral agreements was due to mutual mistake. He contends that the trial court erred in refusing to permit the jury to pass on this point.
 
 
 28
 In California, parol evidence is admissible for the purpose of showing that by reason of mutual mistake a written instrument does not truly express the intention of the parties. California Civil Code, Section 1640. This exception to the parol evidence rule is universally recognized. See 32 C.J.S., Evidence, § 978.
 
 
 29
 Extrinsic evidence may be introduced to show mutual mistake in an action in equity to reform the instrument. Irving v. Cunningham, 1884,66 Cal. 15, 4 P. 766. Such evidence may be interposed as a defense to an action at law on the written agreement. Massie v. Chaton, 1912, 163 Cal. 772, 127 P. 56. And in the federal courts, under the Federal Rules of Civil Procedure, 28 U.S.C., plaintiff is entitled to pursue his claim for equitable relief, i.e., for reformation, in the same action as his suit on the contract-as-reformed, and his suit under the federal securities laws. Ring v. Spina, 2 Cir., 1948, 166 F.2d 546, certiorari denied 1948, 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 368. Nor is plaintiff to be denied such relief merely because he failed to seek it expressly in his pleading as long as the issue of mutual mistake is raised by the pleading. Dioguardi v. Durning, 2 Cir., 1945, 139 F.2d 774, 775; Gins v. Mauser Plumbing Supply, Co., 2 Cir., 1945, 148 F.2d 974; Bowles v. Cabot, 2 Cir., 1946, 153 F.2d 258, 260.
 
 
 30
 We hold that the issue of mutual mistake was adequately raised by the complaint, and that plaintiff was entitled to have his evidence on the issue of mistake admitted and considered by the trial judge. In fact, this evidence was so admitted and considered by the trial judge, who ordered the jury to disregard it. In so doing, the trial court ruled that the extrinsic evidence offered did not show any mutual mistake. Therefore plaintiff was not entitled to reformation. Plaintiff contends that the question of mutual mistake should have been submitted to the jury. We hold otherwise. In his treatise on Federal Practice, P38.22, Moore states, 'An action to reform a written instrument in accordance with the intent of the parties was exclusively equitable, and hence a claim for reformation under the Federal Rules is triable to the court.' Maryland Casualty Co. v. United States, 8 Cir., 1948, 169 F.2d 102; City of Morgantown, W. Va. v. Royal Ins. Co., 4 Cir., 1948, 169 F.2d 713, affirmed on other grounds, 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347.[4] This being the state of the law, the trial court's handling of the issue of mutual mistake was correct.
 
 
 31
 Nor will we disturb the trial court's disposition of the issue. There was no fraud or mistake about the margin agreements. Plaintiff's assignors knew the contents of these writings as was shown by the attendant circumstances and by documentary exhibits in the case in addition to the margin agreements themselves.
 
 
 32
 Finally, plaintiff contends that it was error for the trial court to refuse to instruct the jury that a subsequent oral agreement may alter a written agreement. It was not error for the trial court to refuse to give such a charge here, because, as stated by the trial court, there was no proof of any such subsequent oral agreement. Day entered into two separate and distinct arbitrage transactions. Plaintiff contends that Day entered the second in consideration for the modification of the first. The only evidence advanced by plaintiff in support of this contention is Day's testimony that only upon repeated assurances by Livingstone that he (Day) would not have to put up any more margin would he enter into the second transaction. Day did not testify that the assurances of Livingstone were promises intended to modify the prior written agreement. On the contrary, Day testified, 'The second transaction was exactly as the first, except as to amounts and the date.'
 
 
 33
 For the foregoing reasons we think that the trial court committed no error with respect to the first and second causes of action, and the judgment thereon for defendants is accordingly affirmed.
 
 
 34
 We now consider the third and fourth causes of action. These allegedly arose out of claimed breach of duties owed under the federal securities laws by the defendants to plaintiff's assignors, Day and Hesthal & Co., because of a claimed control by the defendants of Livingstone & Co., the California corporation with which plaintiff's assignors directly dealt.[5]
 
 
 35
 The federal securities laws require a high state of honesty and morality of brokers and dealers in transactions with customers. If a broker or dealer employs any device, scheme or artifice to defraud or makes an untrue or fraudulent statement of a material fact to a customer to induce him to purchase a security, or if he fails to state a material fact, which, in the light of all the circumstances, is necessary to make other facts stated not misleading, or if he extends credit to a customer in violation of the Act or the regulations promulgated pursuant thereto, all to induce a customer to purchase securities, then the broker has violated the law and the customer may recover from him any loss proximately resulting therefrom.[6]
 
 
 36
 There was uncontradicted testimony that Livingstone did make untrue statements of material facts to plaintiff's assignors in order to induce them to purchase the securities in the so-called arbitrage; that Livingstone omitted to state other facts which were necessary in order to make the statements which he had made not misleading; and that Livingstone & Co. did extend credit to plaintiff's assignors in an amount which was in excess of limits permitted by the regulations of the Federal Reserve Board.
 
 
 37
 These uncontradicted facts gave rise to a cause of action in plaintiff's assignors against Livingstone & Co. to recover the losses proximately resulting from these wrongful acts, omissions and statements of Livingstone & Co.
 
 
 38
 Plaintiff, however, sued Bear, Stearns & Co. to recover these losses. Whether plaintiff can recover against Bear, Stearns & Co. for these wrongful acts, omissions and statements of Livingstone & Co. depends first upon whether Bear, Stearns & Co. 'controlled' Livingstone & Co. within the meaning of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78t(a); and, secondly, the jury having found that the defendants did control Livingstone & Co.,[7] whether Bear, Stearns & Co. were absolved from liability by virtue of having acted in good faith, and of not having directly or indirectly induced the wrongful acts done by Livingstone & Co. On this second point the jury found that defendants acted in good faith and did not directly or indirectly induce the wrongful acts of Livingstone & Co.[8]
 
 
 39
 Plaintiff appealed from the trial court's refusal to admit into evidence three memoranda supposedly bearing on the question whether Bear, Stearns & Co. acted in good faith or directly or indirectly induced the wrongful acts of Livingstone & Co.
 
 
 40
 These memoranda were dictated by one Gill, and official of the Bank of Manhattan, and were kept by the Bank in its file on Livingstone & Co. Gill was not living at the time of trial. His memoranda were based on occurrences at certain luncheon meetings at Bear, Stearns & Co. attended by Gill and made reference to the following facts: The introduction of Livingstone to Gill and another official of the bank by Bear, Stearns & Co; the financial stake of the latter (via their wives) in Livingstone & Co.; the direct wire from Bear, Stearns & Co. to Livingstone & Co.; and, incidentally, the very favorable impression Livingstone had made upon Gill. There was evidence of all these facts (except the last) before the jury in other forms, and these facts were not disputed by defendants. There was also reference in one of the memoranda (dictated long after the Bank had extended credit) to a 'Delancey Smith incident vis a vis Livingstone & Co.,' but no further elaboration on the 'incident.'
 
 
 41
 The memoranda were offered as records made in the regular course of business, pursuant to 28 U.S.C. § 1732, the Federal Business Records Act; and were offered as proof of the matter asserted therein. Defendants objected to their admission, on the ground that the memoranda were not made in the 'regular course of any business' as required by the statute and on the grounds that they were irrelevant and immaterial. The trial court excluded the memoranda as not being record of any 'act, transaction, occurrence, or event' within the meaning of the statute.
 
 
 42
 We do not agree with the trial court that these memoranda were not of any 'act, transaction, occurrence, or event' within the meaning of the statute.
 
 
 43
 The supreme Court has said that the Federal Business Records Act 'should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed.' Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645.
 
 
 44
 This court has construed the comprehensive languate of the statute most liberally. See e.g., Pekelis v. Transcontinental & Western Air, 2 Cir., 1951, 187 F.2d 122, 23 A.L.R.2d 1349. The fact that these memoranda are based on informal conferences at lunch does not affect their admissibility. It is wellknown that a great deal of important business is transacted at such luncheon conferences and a responsible corporate officer such as Gill might well deem it advisable 'in regular course of any business' to make notes of transactions at such meetings. We have held that the statute was intended 'to bring the realities of business and professional practice into the courtroom in usable form', and that the statute should not be interpreted in a 'dryly technical' way which would 'reduce sharply its obvious usefulness.' Korte v. New York, N. H. & Hartford R. Co., 2 Cir., 1951, 191 F.2d 86, 91.
 
 
 45
 Nevertheless we do not think that the trial court committed reversible error in excluding the memoranda.
 
 
 46
 Proof that the memoranda were made in the regular course of business was not satisfactory. The witness Varley who testified as to the Bank of Manhattan's part in these transactions first testified that he 'believed' that the memoranda were made in the regular course of business. But when questioned further, he testified that Gill was under no duty to make memos of such transactions ('That was entirely within his province when he chose to make such memoranda.'); that depending upon the importance of the incident, Gill, 'if he thought to do so' would make such memoranda 'if he thought it was pertinent to the situation'; that he 'might write a memorandum of an incident at some time other than when it took place.' The witness was unable to say when Gill would have thought it desirable to make such memoranda. The test of admissibility of memoranda covered by the business entry rule is the 'regularity' of the business practice in making such a record. This is the standard fixed by the Supreme Court when it said that the basis for the rule is 'The probability of trustworthiness of records because they were routine reflections of the day to day operations of a business'. Palmer v. Hoffman, 1943, 318 U.S. 109, 113, 63 S.Ct. 477, 480, 8b7 L.Ed. 654. We believe Varley's testimony did not establish that degree of regularity which is required by the statute.
 
 
 47
 Even if the memoranda were admissible as made in the regular course of business, their exclusion by the trial court was not prejudicial. See Rule 61, Federal Rules of Civil Procedure. The memoranda were offered as proof of the matter asserted therein. As noted above, the facts material to this controversy which were set forth in the memoranda were already in evidence in other testimony and were not disputed by defendants. We cannot see how plaintiff's cause was harmed by the exclusion of the memos.
 
 
 48
 As an alternative to the admission of the memoranda for their full probative value under the Federal Business Records Act, plaintiff sought their admission as bearing only on the state of mind of the Bank of Manhattan. The trial court correctly excluded the memos on this ground because the state of mind of the Bank of Manhattan had no relevancy to the issue being tried.
 
 
 49
 The issue was whether Bear, Stearns & Co. acted in good faith or directly or indirectly induced the acts constituting the violation giving rise to the cause of action under the federal securities laws. The most that can be said for Gill's memoranda is that they show that Bear, Stearns & Co., by virtue of their wives' investment in Livingstone & Co., and by introducing Livingstone to certain Bank of Manhattan officials, played a thoroughly proper and legitimate part in inducing the Bank to extend credit to Livingstone & Co. (And we note here that a most striking thing about the memoranda is that they reveal the high esteem in which the bank held Livingstone, and indicate that the president of Livingstone & Co., himself was a strong factor in inducing the Bank of Manhattan to do business with his company.) What the Bank thought was irrelevant to the issue whether Bear, Stearns & Co. acted in good faith or directly or indirectly induced Livingstone & Co.'s illegal acts that gave rise to the plaintiff's claims here.
 
 
 50
 There being no reversible error in the exclusion of these memoranda, the judgment below as to the third and fourth causes of action will also be affirmed.
 
 
 51
 In the view we take of the case, affirming in its entirety the judgment below, it will be unnecessary for us to consider the other questions presented to us, viz: whether the alleged oral agreements are illegal; whether the third and fourth causes of action are barred by the California Statute of Limitations; and whether the trial judge instructed the jury correctly with reference to the correct measure of damages.
 
 
 52
 The judgment is affirmed.
 
 
 
 [1]
 The trial court put the following interrogatory to the jury as to the first and second causes of action:
 '(1) Was an agreement entered into between Livingstone & Co. and (plaintiff's assignors) that Livingstone & Co. would at no time in the future require (plaintiff's assignors) to put up more than twenty per cent of the cost of the old bonds unless and until the reorganization plan previously approved by the court should later be declared void?'
 The jury answered 'No.'
 
 
 [2]
 The relevant sections of the California Civil Code and the California Code of Civil Procedure are:
 California Civil Code, Section 1625:
 'The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.'
 Section 1640:
 'When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.'
 Section 3399:
 'When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.'
 California Code of Civil Procedure:
 Section 1856:
 'When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:
 '1. Where a mistake or imperfection of the writing is put in issue by the pleadings;
 '2. Where the validity of the agreement is the fact in dispute.
 'But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity, or to establish illegality or fraud. The term agreement includes deeds and wills, as well as contracts between parties.'
 
 
 [3]
 There is language in some California decisions indicating the contrary. However, all of those called to out attention are clearly distinguishable from the case at bar. See e.g. Kreuzberger v. Wingfield, 1893, 96 Cal. 251, 31 P. 109, where the writing involved was a 'mere memorandum so vague and uncertain as not to constitute a contract at all.' Dodd v. Pasch, 1907, 5 Cal.App. 686, 689, 91 P. 166, 167
 
 
 [4]
 California practice appears to be identical with the federal. See Alameda County Title Ins. Co. v. Panella, 1933, 218 Cal. 510, 24 P.2d 163
 
 
 [5]
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), makes it unlawful, by the use of any instrumentality of interstate commerce, to employ, in connection with the purchase or sale of any security, 'any manipulative or deceptive device' in contravention of rules prescribed by the Securities Exchange Commission. Rule X-10B-5 of the S.E.C. makes it unlawful, in connection with the purchase or sale of any security to make untrue statements, to omit to state material facts, or to engage in any 'act, practice, or course of business which operates or would operate as a fraud or deceit.'
 Section 7 of the Act, 15 U.S.C.A. § 78g, gives the Federal Reserve Board authority to prescribe rules with respect to the amount of credit extended on any security. As of January 1, 1946, Regulation T, promulgated under this section, provided that the maximum loan value of a security in a general account was twenty-five per cent of its current market value. As of January 21, 1946, Regulation T provided that such a security had no loan value.
 Section 20(a) of the Act, 15 U.S.C.A. § 78t(a), provides that every person who 'controls' a person liable under the Act 'shall also be liable jointly and severally with and to the same extent as such controlled person * * * unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'
 
 
 [6]
 This paragraph was substantially contained in the charge of the court below
 
 
 [7]
 As to this issue the trial court put to the jury the following interrogatory:
 'Did Bear, Stearns & Co. control Livingstone & Co. within the meaning of control as provided in the Securities Act and the Securities Exchange Act?'
 The jury answered 'Yes.'
 
 
 [8]
 As to this issue the trial court put to the jury the following interrogatory:
 'Did Bear, Stearns & Co. act in bad faith or directly or indirectly induce the acts constituting the violation or the cause of action?'
 The jury answered 'No.'