**KONFORT, S. A., Libelant,**

v.

**THE S. S. SANTO CERRO**, her engines, boilers, etc., **United Fruit Company and United Fruit Steamship Corporation,** Respondents.

United States District Court
S. D. New York.

March 18, 1960.

**2**

Hill, Rivkins, Middleton, Louis & Warburton, New York City (Alan S. Loesberg, New York City, of counsel), for libelant.

Thomas H. Walker, New York City (William J. O'Brien, New York City, of counsel), for respondent, United Fruit Co.

LEIBELL, District Judge.

This is a suit in admiralty commenced June 15, 1956, to recover for the damage to a shipment of 437 coils of steel wire, of which libelant was the consignee and owner, delivered by United States Steel Export Company to respondent, United Fruit Company, at Pier 3, North River, December 8, 1955, in apparent good order and condition, and discharged from respondent's S.S. Santo Cerro at the port of destination Havana, Cuba, December 12th or 13th, with their paper wrappings wet and torn, and the steel wire contents rusted. The insured value of the cargo was $7,637.50. A survey made December 23rd showed an overall damage of about 35%. The respondent, United Fruit Company, answered and denied liability.

Libelant contends that the paper wrappings were wet and the wire rusted (1) by sea water, and (2) by improper ventilation resulting in condensation and sweating on the voyage to Havana and (3) by snow and sleet which was falling when the reels of steel wire were loaded aboard the Santo Cerro at pier 3 North River on December 9, 1955. The respondent argues that the paper wrappings were not strong enough and that the steel wire must have been rusted when delivered to respondent, although its condition could not be seen because of the wrappings.

Counsel have stipulated:

"that the S.S. Santo Cerro is a single screw, geared turbine, re- frigerated cargo vessel built in 1947, with an overall length of 385 feet 11½ inches, a beam of 56 feet, with a gross tonnage of 5,075 tons and a net tonnage of 2,746 tons."

The stowage plan (Ex. B) states that the vessel's draft forward was 17 feet 10 inches, and draft aft 19 feet 6 inches.

The Santo Cerro had four holds. Hold No. 1 was at the bow. She had five decks. The weather deck, the upper 'tween deck, the lower 'tween deck, the orlop deck, and the lower hold. In the lower hold of hatch No. 1, there were stowed 1,600 bags of sodium phosphate (72 tons). No cargo was stowed on the orlop deck and it had no hatch cover. There was cargo on the lower 'tween decks, which had a hatch cover of its own. The 437 reels of steel wire and also other cargo were stowed in the upper 'tween decks, which had a hatch cover. The regular order of loading the hold would be to load the lower hold first and work upwards.

As the cargo was being stowed a checker had a sheet on which to make a record of any cargo that came aboard in a damaged condition. There was no notation concerning any such cargo loaded into hold No. 1.

It was the practice of respondent to load the vessel with a general cargo to be carried to Carribean ports, and to load cargoes of bananas in Central America for transportation to ports in the north. On December 8th and 9th, 1955, when loading cargo in New York, the Santo Cerro was in good condition to take cargo aboard. Her holds had been inspected by an experienced representative of the National Cargo Bureau, a non-profit organization, and a pass of "readiness to load" (Ex. C) was issued December 8, 1955. "A certificate of loading" (Ex. D) was issued December 9th.

No exceptions were noted at New York, on the dock receipt issued by respondent for the 437 reels of steel wire. In answers to interrogatories the respondent has admitted that the shipment was in external good order and condi-

tion when received by respondent at the port of shipment and that unqualified good order and condition receipts were given therefor. If any of the paper wrappings of the coils of wire had been stained or if they had been wet, a notation to that effect would have been made. The coils of wire were so completely covered by the paper wrappings around the coils (as an automobile tire might be covered) that the condition of the wire itself could not have been seen from an inspection of the paper covering. Respondent's usual form of bill of lading acknowledging receipt in apparent good order and condition was issued for the shipment.

In answer to interrogatories respondent admitted that the external good order and condition of the shipment of 437 coils of steel wire changed between the time of receipt by respondent at the port of loading and delivery at destination; and that 271 coils were delivered at destination with covers torn and wet and the steel wire rusted. Respondents denied that any salt water entered any cargo compartments of the vessel. Further, respondents stated that full natural ventilation was afforded the cargo in the upper 'tween deck during the entire voyage; that the temperature of the outside air of the vessel was taken on each day of the voyage and recorded in the log book, but that no temperature of cargo was taken at any time and no dew point was taken from the area where the cargo was stowed.

Respondent also stated in answer to interrogatories that it is respondent's contention that the cargo or its coverings were insufficient to withstand the usual handling with respect to cargo of this nature; and that respondent admitted only apparent good order and condition and would put libelant to its proof as to actual good order and condition. Respondent has not attempted to explain how the shipment became wet while in respondent's care.

The stowage plan (Ex. B) shows where the vessel's cargo was stowed. The respondent's checker and stowage clerk (Siciliano) testified concerning the stowage of cargo in holds 1 and 2. The coils of wire were stowed in hold No. 1 on the upper 'tween deck, somewhat back of the square of the hatch, and also in the wings of the 'tween deck. Some unboxed tractor parts were stowed between the square of the hatch and the coils of wire. The coils of wire were stowed 10 to 14 to a pallet, and tiered 2 high.

The upper 'tween deck was lightly stowed. There was room for the circulation of air. There were two gratings, each several inches thick, placed criss-cross over each other, on the steel floor of the upper 'tween deck. This afforded a circulation of air underneath the cargo. The reels of steel wire did not rest directly on the steel deck.

The shipper, the United States Steel Export Corporation, was a subsidiary of the United States Steel Corporation. The reels of wire were received on November 27, 1955, by the Erie Railroad at the Cuyahoga works of the American Steel and Wire Company, Cleveland, Ohio, a division of the United States Steel Corporation. They were loaded into box car P. A. 80341, a closed steel box car, and the shipment was in apparent good order and condition at that time. The shipment in the box car P. A. 80341 arrived at Weehawken, New Jersey, on December 5, 1955, and was unloaded on December 7th into Erie barge 252, without exceptions. The Erie barge was a completely covered barge. The shipment arrived at the United Fruit Company pier No. 3, North River, on December 8th at 8 A.M.

The shipment was worked from the Erie Railroad barge to the pier between 3:30 and 5:30 P.M. on December 8th. The S.S. Santo Cerro was tied up at pier No. 3 at 5:30 P.M. December 8th, having been moved there by tugs from Weehawken. Cargo was loaded into the upper 'tween deck of hold No. 1 of the vessel in the morning of December 9th prior to noon. Loading of hold No. 1 was completed at 12 noon. The shipment of the 437 reels of steel wire, because

**4**

of its location on the upper 'tween deck was probably the next to the last of the cargo loaded into hold No. 1. The last cargo loaded into the upper 'tween deck space must have been the parts of the tractors that were placed immediately in front of some of the reels of wire at the edge of the hatch.

The official weather reports from the Battery, New York City, show that there was no precipitation on December 5th, 6th, 7th and 8th.

The libelant contends that the paper coverings of the reels of steel wire could have been wet by a trace of snow, and of rain and snow mixed, which the weather report for the Battery, New York City, for December 9, 1955 (Ex. G) shows was falling between 11 A.M. and 3 P.M. Between 10 and 11 A.M. snow was falling; and between 11 A.M. and 3 P.M. there was a mixture of snow, sleet and rain.

■ The vessel's log (Ex. E) contains an entry that at 12:00 noon the stevedores finished loading at hatch No. 1. It also shows that at 12:00 noon the weather was overcast, it was snowing, and that the stevedores stopped work for their meal hour. They resumed at 1:00 P.M. There are no records to show the exact time at which libelant's reels of steel wire were loaded aboard, but the log entries indicate that it could not have been later than 12 noon. It was probably between 11 A.M. and noon and during that time there was a light mixture of snow and sleet. This continued until 3 P.M. The No. 1 hatch on the weather deck, directly above the upper 'tween deck, remained open until 3:15 P.M. There is no proof that the respondent put up any "tent" or other covering, to prevent any of the precipitation from falling into the hatch. Exposing the coils of steel to those conditions was negligence. Some wetting of the coverings of the coils of wire probably occurred at that time, but its extent has not been shown; and there were two other more likely and efficient causes of the wet condition of the wrappings of the coils of steel wire and the rusty con-

dition of their contents, which was noted when they were discharged at Havana.

One cause of the wetting of the paper wrappings of the coils of steel wire while stowed aboard the vessel was the open ventilator for the upper 'tween deck space of hold No. 1. The ventilator was located on the weather deck and is shown on Exhibit 7, a photograph of the forward part of the weather deck of a sister ship of the Santo Cerro. Two ventilators are shown, at the left of the white superstructure, with what appears to be their covers dropped down.

Full natural ventilation came through this ventilator. While the vessel was passing from the cold climate of the north to the warmer climate of the south on the voyage from New York to Havana, the temperature of the outside air increased. It entered the 'tween deck space, which must have been at a lower temperature. Any moisture in the air would condense under those conditions. Records of the temperature of the outside air were taken each day of the voyage and the log book shows how those temperatures increased from 38 and 40 degrees when the Santo Cerro left New York on December 9th to 45–50 and 56 the following afternoon, to 70, 73 and 78 on the afternoon of December 11th, and to 78 and 79 on the 12th.

No temperature of the cargo was taken at any time, nor was any dew point calculated for the area where the cargo was stowed. Improper ventilation would produce a sweat condition, that could account for some wetting of the coils of wire while in respondent's custody. *Armour & Co. v. Compania Argentina De Navegacion Dodero, S. A.,* D.C.S.D.N.Y., 1958 A.M.C. 332, affirmed 2 Cir., 263 F.2d 323.

But, in my opinion, sea water was the principal cause of the wetting the coils of wire received while in respondent's custody. That was the conclusion of the surveyor (Holgado) who made a survey of the shipment in libelant's warehouse on December 23rd, 1955. His deposition will now be discussed.

The testimony of Antonio Reus Holgado of Havana, Cuba, was taken in December 1958, at the instance of libelant, on direct and cross interrogatories. He testified that in December 1955 he was employed as a surveyor by John R. Wheldon, acting on behalf of the Trust Insurance Agency, which had an open policy on Konfort, S. A., the libelant. On December 23, 1955, he surveyed a shipment of 437 coils of U. S. S. Bright Grade Steel Wire packed in paper. The shipment was in consignee's warehouse where Holgado made the survey. He signed a survey report. The coils of wire had been entered in the custom house December 13, 1955. They were delivered to a warehouse on consignee's premises on December 22, 1955. The carrier, United Fruit, was not present at the survey. Lloyd's had a form of notice of survey which it would send to a carrier in advance of a survey. Lloyd's agent notified the carrier either by hand or by mail.

When Holgado saw the coils of wire at the warehouse, a "lot" of them had wrappings on them. He removed the wrappings from many of them. He testified by deposition that about 60% to 70% of the coils were very rusted and the rest were less rusted. Underneath the stains on the paper wrappings the rust on the wire could be seen. He tested samples of the steel wire and paper wrappings for the presence of salt, using nitrate acid and silver nitrate to make the test. He made four to six tests of the steel wire, and two or three of the paper wrappings. The silver nitrate test is the test used by Lloyd's. .

Holgado arrived at a depreciation of 35%. The depreciation was based on the cost at the warehouse; the insured value of $7,637.50. The depreciation applied to the whole shipment. It was an average percentage. The invoiced price of the shipment, according to Exhibits 5A and 5B, was $6,817.85.

The answers of Holgado to certain cross interrogatories and redirect interrogatories show that respondent was given notice of the survey made by Holgado before the survey was made, and that respondent did not attend the survey.[1]

The respondent questions this, but has presented no proof that it did not receive a notice of the survey. Nor did respondent itself request an opportunity to make a survey of the damage. Respondent had knowledge of the condition of the coils of wire on their discharge at Havana through the report of Norgulf Terminals, Inc., its stevedore (Exs. A and A–1), dated December 12, 1955. The attorneys for the parties have stipulated that the Havana stevedore took exceptions to the steel wire shipment—"namely that 271 coils had their paper coverings torn and wet with

1. Cross Interrogatories propounded to Mr. Antonio Reus Holgado by Respondent and the answers thereto.

"7. Q. State if you invited the carrier, United Fruit Company, to examine the coils at the time that you held your survey. A. That is something that must be done by the consignee but Lloyd's has a form, the name of which I do not recall. It is a notice in which we state the date on which we are holding a survey and we invite them to witness the survey.

"8. Q. State if the carrier, United Fruit Company, examined the coils at the same time that you made your survey. A. No, sir."

Re-Direct Interrogatories propounded on behalf of the Libelant to Mr. Antonio Reus Holgado and the answers thereto.

"3. Q. With reference to question Numbers 7 and 8 of the cross-interrogatories was notice of damage given to the carrier by anyone? A. We notified them with the form which I mentioned previously.

"(a) Q. If so, who gave that notice to the carrier? A. I do not know whether the carrier was notified through a message sent by hand or by mail but they were notified. We did, Lloyd's Agents.

"(b) Q. Is it the practice at Havana for the consignee or a representative of the consignee to give notice of damage to the carrier? A. It should be the consignee who gives this notice but usually they do not do so and Lloyd's Agent does it."

the contents rusty". The parties also stipulated that the respondents received a claim letter from the attorneys for libelant with regard to the shipment on or about June 20, 1956. I have concluded that the respondent received notice of the December 23, 1955, survey but did not attend. Respondent cannot now complain of the nature and the scope of the survey. The Rosalia, 2 Cir., 264 F. 285, 290.

The log book (Ex. E) under date of December 9th, 1955, shows that the Santo Cerro sailed from New York at 3:42 P.M. The pilot was dropped at Ambrose L. V. at 5:07 P.M. Barnegat L. V. (New Jersey) was reached about 7:30 P.M. The weather was overcast at 8 P.M.; the wind was Force 5 and the sea was "rough and N'ly". At 12 midnight the weather was overcast, there was a "rough W'ly sea and spray", and the vessel was shipping spray forward. The wind was W.N.W.—Force 5.

The December 10th log shows that at 4 A.M. the wind was W.N.W.—Force 7. At 8 A.M. the wind was N.W.—Force 7; and at 12 noon it was Force 6. For the balance of the voyage the winds were light or moderate. Force 6 is a strong breeze, 34 miles per hour and Force 7 is a moderate gale, 40 miles per hour, according to the Beaufort Scale printed on the first page of the log book.

The December 10th log also shows that at 4 A.M. it was cloudy, with a rough W'ly sea and swell; that the vessel was rolling heavily at times and taking spray forward. The 7 A.M. entry states that the weather was still cloudy, the vessel was rolling, and the sea still rough and spraying over all. The 12:00 P.M. entry states that the weather was partly cloudy, with a rough NW'ly sea and swell. At 12:42 P.M. the vessel was off Cape Hatteras. At 4:00 P.M. there was a Moderate W'ly sea and swell. At 7 P.M. the vessel was rolling easily. For the balance of the voyage the vessel met with only moderate seas.

The Santo Cerro arrived at Havana and was secured to the dock at 4:31 P.M. December 12, 1955. At 5 P.M. two gangs of stevedores opened and started discharging at No. 1 and No. 3 hatches. At 11 P.M. the stevedores ceased discharging at No. 1 hatch and resumed at 7 A.M. the following morning, December 13th, and finished discharging at all hatches at 4 P.M.

There was no water in the bilge of hold No. 1 at 8 A.M. December 9, 1955. At 4 P.M. there were four inches of water in the bilge. On December 10th at 8 A.M. it was six inches; and at 4 P.M. two inches. On December 11th the water in the bilge of hold No. 1 was one inch and it remained thus until the vessel reached Havana. The bilge soundings indicate that there was some pumping in between the soundings recorded on December 9th and 10th. Where did the water in the bilge of Hold No. 1 come from? The bilges were sealed off from each other. There were separate scuppers leading from the 'tween decks to the bilge. There was no water in the ballast tank of No. 1 hold. The vessel's captain testified that he saw no signs of salt water in the 'tween decks which he inspected after the vessel left Havana and was on its way to pick up a cargo of bananas at a Central American port.

Libelant contends that the reels of steel wire were damaged by salt water. The surveyor in Havana so found.

Respondent contends the damage could not have been caused by sea water because there was no way sea water could have entered the vessel during its voyage from New York to Havana. The log shows that the first stage of the voyage was stormy with spray all over the vessel especially at the bow where hatch No. 1 was located. The captain of the vessel testified that the hatch cover was strong and covered with four tarpaulins battened down, and that he did not see them "flopping" during the storm. There was also an open ventilator, forward of the hatch, and N'ly and NW'ly winds were blowing in that direction. Spray was all over the ship. The winds could have carried the spray into the ventilator. The captain testi-

fied that the spray could not have reached the 'tween deck cargo because of the circulatory course it would have to take after entering the ventilator.

The deposition of the surveyor states positively that he made a number of tests for the presence of salt, both on the torn paper wrappings of the reels and on the steel wire. His deposition was made under oath. I cannot say that the other proof at the trial was sufficient to rebut the surveyor's positive and detailed description of how he went about his survey and what he found.

■ I have concluded that the salt water spray reached the coils of steel wire either through the tarpaulins of the No. 1 hatch or through the weather deck ventilator of the 'tween deck of hold No. 1.

■ Where cargo suffers sea water damage while in the custody of the carrier, a presumption of negligence arises. Wessels v. The Asturias, 2 Cir., 126 F.2d 999, 1001.

■ The burden was on the carrier to show what caused the paper wrappings of the reels of wire to become wet during the voyage. The discharge of the carrier's "extraordinary duty" as a bailee was under the control of the carrier. The facts and circumstances upon which the carrier might rely under the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1300 et seq., to relieve it of the duty to carry the shipment undamaged to the port of discharge were peculiarly within the carrier's knowledge and unknown to the shipper. In consequence, the law imposes upon the carrier "the burden of the loss which he cannot explain or, explaining, bring with the exceptional case in which he is released from liability". Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373; Schroeder Bros., Inc. v. The Saturnia, 2 Cir., 226 F.2d 147.

During the trial I suggested that libelant get somebody from the plant to testify to the condition of the coils of wire before they were wrapped, how they were wrapped, and where they were kept before they were put in the steel box car. Libelant's counsel stated that he thought he was not going to be able to get evidence of the condition of the coils inside the wrappers at the time of shipment and that he would rely on the fact that he had a clean bill of lading and the fact that the external condition of the wrappers admittedly changed while the shipment was in respondent's custody; and that they were wet and their contents were rusty when discharged at Havana. Legally, this position was justified and supported by the following cases. Nelson v. Woodruff, 1 Black 156, 66 U.S. 156, 160, 17 L.Ed. 97; Reider v. Thompson, 5 Cir., 197 F. 2d 158, 161; McNeely & Price Co. v. Ellerman & Bucknell S. S. Co. (The City of Windsor), D.C., 100 F.Supp. 339, 341; E. S. Ullmann-Allied Co. v. The George E. Pickett, D.C., 77 F.Supp. 988.

Respondent suggests that the rust on the steel wire was due to some internal condition. There is no direct proof of that and nothing from which it could reasonably be inferred. Although libelant did not call any witness to show the condition of the steel wire itself before it left the plant at Cleveland, there was proof that the shipment had received clean bills of lading from the Erie Railroad and that the reels were in apparent good order and condition when received by respondent at pier 3 North River. It seems hardly likely that the American Steel and Wire Company, a responsible corporation, would deliberately wrap and tie up wire that it knew to be rusty, and not just one reel but several hundred; or that either it or the United States Steel Export Corporation would pay the railroad's freight charge of over $1,000, or the respondent's freight charge of over $600, for a cargo that was known to be damaged before it left the plant.

There is no proof that any water came into contact with the reels before they were delivered to respondent's pier. If that had happened the wrappings would have shown stains, even if the wetting

**8**

had dried out. The stains on the wrappings would have been visible to those who received the shipment for respondent at pier 3 North River. If the wrappings had been wet or stained respondent would not have given a dock receipt containing no exceptions, and a bill of lading that stated that the reels were "in apparent good order and condition".

The shipment was not of such a natural composition (steel wire) as to harbor internal properties of deterioration, such as rusting. The presence of water or moisture, an external agent, that penetrated the paper wrappings and contacted the steel wire, would be a necessary producing cause of the rust. The wet condition of the paper wrappings accounts for the rusted condition of the steel wire contents.

The internal damage, the rusty condition of the coils of wire, corresponded to the external wetting visible when they were discharged at Havana with their wrappings wet and torn, and the wire rusted. A similar situation was presented in The City of Windsor case, supra. As stated in the Reider v. Thompson case, supra, the outturn itself, may be considered as evidence of the carrier's negligence.

The 437 coils of steel wire, were each wrapped with one layer 60 pound crepe paper, automatic coiler quality. The coil ties were flat bands. The paper wrapped bundles were tied securely with four tie wires or spiral tie wires outside the wrapping. The coils of wire were approximately 135–150 pounds each. The gross weight of the 437 coils was 61,311 pounds. (Exs. 5A and 5B.)

The respondent argues that the paper wrappings were not strong enough. But they were strong enough to properly serve their purpose in the transportation of the reels of wire from Cleveland, Ohio, to pier 3 North River. And they were accepted by respondent for carriage to Havana. The wrappings were not torn or wet when loaded aboard the Santo Cerro. No objection was made to the wrappings at that time, although they were inspected by the checker as they came aboard, to note any defective condition. The wetting the paper wrappings received aboard ship would weaken them and make them more likely to tear. They were both wet and torn when they were discharged in Havana, and the contents were visibly rusty.

Libelant has called my attention to a recently reported decision by Judge Roche in the case of California Packing Corporation v. The Empire State, D.C. N.D.Cal., 180 F.Supp. 19, which involved a number of issues quite similar to those presented by the case at bar. I wish to add it to the other authorities hereinabove cited.

While William C. Keppler, respondent's Freight Claim Agent, was on the stand, he was questioned by respondent's attorney concerning a report he had in his files, received from Norgulf Terminals, Inc., the stevedoring company engaged by respondent to discharge the cargo of the S.S. Santo Cerro at Havana, Cuba.

Mr. Keppler testified that it was the practice of the respondent to have its stevedores at every port of call of respondent's vessels, on voyages originating in New York, to report to the respondent's New York office on the condition of the cargo at its outturn at the port of discharge. In order to comply with respondent's directions, the stevedoring company, when discharging cargo from respondent's vessels, would have its employees make a tally sheet record of any items of the cargo that were discharged in a damaged condition. That information was then embodied in a report prepared by the stevedoring company and forwarded to the New York office of the respondent.

Mr. Keppler identified the original report (in Spanish) which he had received from the stevedoring company, Norgulf Terminals, Inc., on the condition of the cargo of the Santo Cerro when it was discharged at Havana on December 13, 1955. The report (Ex. A for Id.) and an English translation thereof (Ex. A–1 for Id.) were offered in evidence by respondent, claiming that the report of

the stevedoring company on the condition of the entire cargo was a record made for respondent in the regular course of business of respondent and was admissible under T. 28 U.S.C. § 1732 [2]. The correctness of the English translation is conceded.

Libelant did not object to so much of the report as concerned the shipment of the coils of steel wire that are the subject of this suit, but did object to the balance of the report relating to the other items of the cargo discharged at Havana in a damaged condition. Respondent contends that the whole report is admissible to show that no other item of cargo (except a case of milk that fell overboard) was discharged in a wet condition. The Court reserved decision on the question of admissibility of those two exhibits and directed counsel to cover that in their briefs at the end of the trial. This they have done.

Under the terms of its bill of lading it was the carrier's duty to discharge the cargo at the port of Havana. The Norgulf Terminals, Inc., a stevedoring company, was engaged by the respondent to discharge the cargo. A stipulation of facts signed by the parties and "so ordered" by a judge of this Court November 7, 1958, provides:

"2. That upon the discharge of the cargo, which is the subject matter of this suit, at Havana, Cuba, Nor-Gulf Terminals, Inc. acted as stevedore and took exceptions to the cargo, namely that 271 coils had their paper coverings torn and wet with the contents rusty."

The fact that the stevedoring company was acting as an agent or contractor of the respondent in discharging the cargo does not affect the admissibility of the report as a record of the respondent kept in the regular course of business of the respondent. It was part of the contractor's job of unloading the vessel, pursuant to its arrangement with the respondent, to make a record of the

---

2. § 1732. Record made in regular course of business; photographic copies

"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind.

"(b) If any business, institution, member of a profession or calling, or any department or agency of government, in the regular course of business or activity of government, in the regular course of business or activity has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence, or event, and in the regular course of business has caused any or all of the same to be recorded, copied, or reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic, or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless held in a custodial or fiduciary capacity or unless its preservation is required by law. Such reproduction, when satisfactorily identified, is as admissible in evidence as the original itself in any judicial or administrative proceeding whether the original is in existence or not and an enlargement or facsimile of such reproduction is likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement or facsimile does not preclude admission of the original. This subsection shall not be construed to exclude from evidence any document or copy thereof which is otherwise admissible under the rules of evidence. As amended Aug. 28, 1951, c. 351, §§ 1, 3, 65 Stat. 206."

items of cargo discharged in a damaged condition and to prepare and forward a report thereof to respondent in New York. This was done at the respondent's insistence (United States v. Rappy, 2 Cir., 157 F.2d 964, 966) and pursuant to a regular practice of respondent. Understandably, the stevedoring company would wish to retain the tally sheets in their own files, and to embody their contents in one report which would be forwarded to respondent in New York.

The report is relevant and material to the issues in this case. It was prepared in accordance with a regular practice of the respondent and is admissible under § 1732 of T. 28 U.S.C. That section has been construed "most liberally" by the Court of Appeals of this Second Circuit as Judge Waterman remarked in Smith v. Bear, 237 F.2d 79. Of course the proof that the report was made in the regular course of the business must be satisfactory. Mr. Keppler, in charge of respondent's claim department, testified as to the regularity of the business practice of the respondent in requiring and receiving a report of what was discovered in the way of damaged cargo when its vessels were unloaded at foreign ports. Although the report would be a useful record for the stevedoring company to protect itself against any possible claim that the way the stevedores handled the cargo resulted in damage to some of the items shipped, it would also be a necessary record for the stevedoring company's customer, the ship owner, in the event of any claims by shippers for damage to items of the cargo. All the cargo on the Santo Cerro was destined for Havana and was there discharged by the stevedoring company.

As stated in Judge Waterman's opinion (at page 89) in Smith v. Bear, supra, "The test of admissibility of memoranda covered by the business entry rule is the 'regularity' of the business practice in making such a record". "This is the standard fixed by the Supreme Court * * * " The testimony of Mr. Keppler shows that the report made by the Norgulf Terminals, Inc., to respondent (Exs.

A and A–1, for Id.) meets the regularity test and the two exhibits are accordingly received in evidence.

This opinion contains the Court's findings of fact and conclusions of law. Rule 52(a), Fed.Rules Civ.Pro., 28 U.S.C.

Libelant is entitled to an interlocutory decree holding the respondent liable for the damage sustained by the coils of steel wire shipped from pier 3, North River, New York City, to Havana, Cuba, on respondent's S.S. Santo Cerro, to libelant as consignee, in December 1955. A commissioner will be named in the decree to ascertain and report the amount of the damage. Submit a form of interlocutory decree for the Court's signature.