Ralph MOSCARELLI, Julia Moscarelli, Sylvia Chernofsky and Hyman Chernofsky, each individually and on behalf of all persons similarly situated purchasing securities registered on a National Securities Exchange during the years 1965 and 1966 through A. L. Stamm & Co., as Broker, Plaintiffs,

v.

Alfred L. STAMM, Everard M. C. Stamm, Harry Rosenbaum, Hines O. Metz, Philippe E. Baumann, Malcolm J. Babbin, R. Bruce Rexmann, Alexander Benisatto and Robert C. Stamm, each individually and as co-partners doing business under the firm name and style of A. L. Stamm & Co., Defendants.

No. 67–C–520.

United States District Court
E. D. New York.

July 22, 1968.

Jaffe, Cohen, Berman & Crystal, New York City, for plaintiffs, Ernest Allen Cohen, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants, Alfred J. Morgan, Jr., Joseph A. Kilbourn, and Robert B. Budelman, Jr., New York City, of counsel.

BARTELS, District Judge.

This is an action by the plaintiffs individually and on behalf of others who purchased securities during 1965 and 1966 through the brokerage firm of A. L. Stamm & Co., to recover damages for losses resulting from numerous trades on a national securities exchange. Jurisdiction is predicated upon 15 U.S. C.A. §§ 77v and 78aa.

Defendants (partners of A. L. Stamm) move to dismiss the action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, 28 U.S. C.A., and the plaintiffs cross-move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiffs charge that Stamm through its employee Adolph Bennett, Jr. and other employees induced the plaintiffs to make purchases and sales of securities in the maximum amount on a national securities exchange for the benefit of Stamm by means of fraudulent representations and agreements whereby Stamm agreed that payment for the securities could be made by the plaintiffs "as each might from time to time determine himself able to do" without complying with the applicable margin requirements of the Securities Exchange Act of 1934 (Act) and, further, that Stamm would provide the necessary credit and would not sell the securities so purchased for non-payment or failure to provide collateral; that in breach of these fraudulent statements and these agreements Stamm, after permitting the purchase and sale of securities in violation of the prescribed margin requirements, subsequently demanded additional collateral and sold plaintiffs' securities for their failure to comply, causing them substantial losses. They allege that defendants' acts violate 15 U.S.

C.A. §§ 77*l*, 77q, 78g, 78j(b), 78*o*,[1] 78bb and 78cc and the rules and regulations thereunto appertaining.

Defendants, in their answer and affidavits, deny knowledge of the charges except they admit the number of purchases and sales made and in turn counterclaim against the plaintiffs for unpaid balances in plaintiffs' accounts, accusing them of employing deceptive and manipulative devices in violation of Section 10(b) of the Act, 15 U.S.C.A. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by entering into a fraudulent conspiracy with one or more of Stamm's employees to place orders for the purchase and sale of securities, knowing that plaintiffs could not pay for the same but representing that they were ready, able and willing to do so; that upon discovery of the fraudulent conspiracy the defendants sold the securities in plaintiffs' accounts for failure to make payment therefor, and that by reason of said conspiracy the defendants sustained monetary losses, for which they seek recovery. Defendants contend that plaintiffs' active participation and conspiracy with Stamm's employees bars them from recovery and that their claims do not satisfy the requirements of Rule 23 for a class action.

Plaintiffs' right of action is based upon four theories of recovery, (1) churning of plaintiffs' accounts in violation of Section 10(b) and Rule 10b–5 promulgated thereunder[2]; (2) liability resulting from Stamm's violation of the margin requirements prescribed by Section 7(a) and (c) of the Act (15 U.S.C.A. § 78g(a) and (c)) and Regulation "T" issued by the Board of Governors of the Federal Reserve System thereunder, 12 C.F.R. §§ 220.1 *et seq.*; (3) breach of agreement not to sell plaintiffs' securities for failure to provide collateral, and (4) fraudulent representations by Stamm not to sell plaintiffs' securities for such failure. They claim there is no factual issue involved upon the first two theories and that they are therefore entitled to a partial summary judgment as to liability.

■ The right to a summary judgment, partial or otherwise, depends not only upon the existence of a genuine issue of material fact but also upon whether the admitted facts establish a legal cause of action. Rule 56(c), Fed.Rules Civ.Proc., 28 U.S.C.A.; Krieger v. Ownership Corporation, 270 F.2d 265 (3 Cir. 1959). Stamm admits that plaintiffs purchased a large number of securities through its agency within a short time without adequate security through the dishonest acts of its employees Adolph Bennett, Jr. and Kevin Mullen "with the fraudulent result that Stamm's funds were utilized to pay for the securities so purchased". Plaintiffs assume that defendants are bound by the conduct of their employees in spite of the charge made by the defendants concerning the conspiracy between the employees and the plaintiffs, and that the admissions of the defendants with respect to multiple transactions and violation of the margin requirements automatically entitle the plaintiffs to a partial summary judgment upon the issue of liability. As a matter of law, this conclusion does not follow and summary judgment must be denied for the reasons hereafter discussed.

### Churning

This claim for relief is founded upon Section 10(b) of the Act and Rule 10b–5 issued thereunder, which, in substance, makes unlawful the employment of any manipulative or deceptive device or contrivance by any person in connection with the purchase and sale of any security upon a national securities exchange or otherwise. Rule 10b–5 makes it un-

---

1. Since plaintiffs allege that the securities were traded upon national securities exchanges, reliance upon Section 15(c) of the Act (15 U.S.C.A. § 78*o*(c) excluding transactions on national securities exchanges, is misplaced.

2. Such a violation would also breach Section 17 of the Securities Act of 1933 (15 U.S.C.A. § 77q(a)), the language of which is very similar to Rule 10b–5.

lawful for any person so engaged "(a) To employ any device, scheme, or artifice to defraud," and "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." In defining these terms with respect to Section 15(c) of the Act (15 U.S.C.A. § 78o(c)) pertaining to broker-dealer transactions on Over-the-Counter markets, the Commission's rule states that such devices include "any act of any broker or dealer designed to effect with or for any customer's account in respect to which such broker or dealer or his agent or employee is vested with any discretionary power any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account." 17 C.F.R. § 240.15cl–7(a).

 Over-trading, *per se*, in an account whose transactions are initiated by a customer does not constitute churning in the absence of any fiduciary relationship. See, Thomson & McKinnon, 35 SEC 451, 454 (1953). But over-trading will constitute churning whenever a broker or dealer, who is in a position to determine the volume and frequency of transactions by reason of the confidence imposed in him, abuses the confidence of the customer for personal gain by frequent and numerous transactions disproportionate to the investment in the account. Looper & Co., 38 SEC 294,-296 (1958); 3 Loss, Securities Regulation, 1479–80 (2nd Ed. 1961); Note, Churning by Securities Dealers, 80 Harv. L.Rev. 869 (1967). Such conduct on the part of the broker provides an action for breach of trust under *common law* principles. But breach of trust would not be sufficient to confer jurisdiction upon this Court in the absence of diversity.

 The Act does not expressly provide for civil liability for violation of Section 10(b). Nevertheless, in order to make effective the objectives of the Act, "it is the duty of the [federal] courts to be alert to provide such remedies as are necessary to make effective the congressional purpose". J. I. Case Company v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Deckert v. Independence Shares Corporation, 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940). Since one of the purposes of the Act is the protection of the individual investor as well as the public at large, a civil tort has been implied from a violation of the standard of conduct set forth in the Act upon the principles enunciated in Restatement (Second), Torts, § 286 (1965). J. I. Case Company v. Borak, supra; Remar v. Clayton Securities Corporation, 81 F.Supp. 1014 (D.Mass.1949); Reader v. Hirsch & Co., 197 F.Supp. 111 (S.D. N.Y.1961); Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966).[3] It is quite clear in this Circuit that a tort will be implied from a Section 10(b) violation. Vine v. Beneficial Finance Company, 374 F.2d 627 (2 Cir. 1967); Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2 Cir. 1951).

 The question is whether churning comes within the definition of such a tort, an issue not expressly determined in this Circuit. In the absence of deception, a mere breach of a fiduciary duty may not set forth a Section 10(b) violation. O'Neill v. Maytag, 339 F.2d 764 (2 Cir. 1964). But churning as a stock manipulation, involving a breach of the customer's confidence, constitutes a deception arising theoretically from a broker's violation of his promise and representation to fairly deal with the customer implied from the customer-broker relationship. See, Charles

**3.** Three sections of the Act expressly provide for civil liability: Section 9(e), 15 U.S.C.A. § 78i(e); Section 16(b), 15 U.S.C.A. § 78p(b), and Section 18(a), 15 U.S.C.A. § 78r(a). From these sections a plausible argument has been made that Congress did not intend the implication of a civil tort under Section 10(b), 15 U.S.C.A. § 78j(b), which contains no such provision. See Ruder, Civil Liability under Rule 10b–5: Judicial Revision of Legislative Intent?, 57 NW U.L.Rev. 627 (1963).

Hughes & Co., Inc. v. SEC, 139 F.2d 434, 435–36 (2 Cir. 1943), cert. denied, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077; 3 Loss, Securities Regulation, supra, at 1482–93; Churning by Securities Dealers, supra, at 870. Every fraudulent and deceptive device in connection with the purchase and sale of securities is prohibited by Section 10(b) and Rule 10b–5. A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2 Cir. 1967). District courts in other jurisdictions have held that churning as a deceptive device was included in the Section 10(b) proscription (Lorenz v. Watson, supra; Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968); Nash v. J. Arthur Warner & Co., 137 F.Supp. 615 (D.Mass.1955)), a conclusion which is consistent with the expanding definition of fraud under the federal securities laws and adopted by this Court. See also, R. H. Johnson & Co. v. SEC, 97 U.S.App.D.C. 364, 231 F.2d 523 (1956), cert. denied, 352 U.S. 844, 77 S.Ct. 48, 1 L.Ed.2d 60; Norris & Hirshberg, Inc. v. SEC, 85 U.S.App.D.C. 268, 177 F.2d 228 (1949). Federal jurisdiction being present under the Act, plaintiffs may assert their claim of common law breach of trust. United Mine Workers of America v. Gibbs, 383 U.S. 715, 724–727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933).

 Plaintiff Moscarelli claims his account was turned over approximately twelve (12) times each month for a period of four months, and that a chart of the purchases and sales of National Video Corporation stock in his account reveals fifteen (15) purchases and twelve (12) sales in less than four months. According to the complaint, similar excessive turnover rates exist in the accounts of the other plaintiffs. There is little doubt that such purchases and sales took place. Defendants deny not the number of transactions, but that the transactions were unauthorized by plaintiffs or that there was any misrepresentation to the plaintiffs. To establish churning, it is not sufficient to prove merely an abnormal number of purchases and sales within a short period. Aside from the issue of Stamm's liability for its agents' conduct which is hereafter considered, there are other issues of fact which remain open, such as (1) the nature of plaintiffs' accounts; (2) the existence of any misrepresentations or agreements on the part of Stamm with respect to margin, collateral or otherwise; (3) the materiality and reliance thereon upon the part of the plaintiffs; (4) plaintiffs' consent to or active participation in the wrongful acts, and (5) as to the common law action, the existence of a fiduciary relationship.

Until these issues are resolved, judgment on the issue of churning must be postponed for trial.

### Violation of Margin Requirements by both parties

 Section 7(c) of the Securities Exchange Act prohibits the extension of credit by brokers or dealers in contravention of the rules and regulations of the Board of Governors of the Federal Reserve System for the purchase or carrying or trading of any security. Under this section the Board of Governors issued Regulation T, prescribing certain minimum margin requirements to be provided by a customer predicated upon a percentage of the current market value of the securities, and also setting forth the time limit within which the necessary margin deposit must be made. No duties or restrictions were imposed by the Act and the Regulation upon the investor-customer. The primary purpose of the margin requirements was to provide the Board with an effective method of reducing the amount of the Nation's credit resources which could be directed by speculation into the stock market. No private civil remedy was provided in the statute for violation of these requirements, although the House Report noted that "protection of the small speculator by making it impossible for him to spread himself too thinly * * * will be achieved as a by-product of the main purpose." H.R.Rep. No. 1383, 73 Cong.,

2d Sess. 8 (1934). Accordingly, there is respectable authority for the implication of a private remedy to enforce the liability or duty directly created by the Act. See, Smith v. Bear, 237 F.2d 79, 87–88, 60 A.L.R.2d 1119 (2 Cir. 1956); Remar v. Clayton Securities Corporation, supra; Appel v. Levine, 85 F.Supp. 240 (S.D.N.Y.1948); Warshow v. H. Hentz & Co., 199 F.Supp. 581 (S.D. N.Y.1961); Glickman v. Schweickart & Co., 242 F.Supp. 670 (S.D.N.Y.1965). Although this result has been criticized[4] and the credentials for creating such a remedy under Section 7(c) are not as persuasive as those supporting the Section 10(b) right, there is little doubt that the broad purposes of the Act justify the implication. See, J. I. Case Company v. Borak, supra. The difficulty arises not from the implication of a private right of action but in defining the nature and extent of liability imposed, placing proper emphasis upon the primary purpose of the enactment.

Plaintiffs urge that the defendants' liability is absolute regardless of any participation by the investor in the violation of the statute, because they say, the statute deems small investors incapable of protecting themselves, citing Remar v. Clayton Securities Corporation, supra; Reader v. Hirsch & Co., supra; and Myer v. Shields & Co., 25 A.D.2d 126, 267 N.Y.S.2d 872 (1st Dept. 1966). See also, Restatement (Second), Torts, §§ 61, 483 and 892C. These decisions hold only that upon a motion for dismissal the mere participation by the customer does not *per se* bar his recovery. There is no disagreement with the principles enunciated by those cases, which, however, do not purport to adjudicate the effect of willful and active participation in such violations. In their answer and supporting affidavits defendants assert that they acted in ignorance of their employees' conduct

and that the plaintiffs conspired and, in effect, participated with their employees in violation of Section 7(c) of the Act and the regulations issued thereunder and gambled in the market with defendants' funds in the roseate expectation of large profits. In construing this statute, one notes that only the exceptional statute is interpreted as intending to place the entire responsibility upon defendants for the injury which has occurred, and there is no reason to believe that this statute falls within that exception. See, Restatement (Second), Torts, § 483(c) (1965). As above stated, the primary purpose of Section 7(c) and Regulation T was to prevent excessive diversion of funds by speculation into the stock market. To permit a broker's customer, who conspires or aids and abets the broker in violation of the provisions of Section 7(c), to recover his losses from his broker, would defeat the very purpose of the section and the economic considerations which underlie its enactment. It is hard to believe that Congress intended that the "by-product" of the Act, i. e., financial protection of the small investor, should supersede the primary purpose of the Act. See, Billings Associates, Inc. v. Bashaw, 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dept. 1967); Bronner v. Goldman, 361 F.2d 759 (1 Cir. 1966), cert. denied, 385 U.S. 933, 87 S.Ct. 295, 17 L.Ed.2d 214; Zatz v. Hertz, Neumark & Warner, 262 F.Supp. 928 (S.D.N.Y. 1966); Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum.L.Rev. 1462, 1473 and 1476 (1966). It is fairly obvious that Congress did not intend to protect investors at all times and under all circumstances regardless of their conduct.

It follows that the broker's implied civil liability is not absolute but is subject to the traditional tort concepts of causation and contributory neg-

---

**4.** Note, *Federal Margin Requirements as a Basis for Civil Liability*, 66 Colum.L. Rev. 1462, 1467–71; see also, Nichols & Co. v. Columbus Credit Corp., 204 Misc. 848, 126 N.Y.S.2d 715 (Sup.Ct.

N.Y.County, 1953), affd., 284 App.Div. 870, 134 N.Y.S.2d 590 (1st Dept.1954); Goodbody & Company v. Penjaska, 8 Mich.App. 64, 153 N.W.2d 665 (1967).

ligence or analogous conduct. See, Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9 Cir. 1962). As Judge Kaufman succinctly stated in A. T. Brod & Co. v. Perlow, supra, 375 F.2d at p. 397, "the practices allegedly employed by the Perlows will, if allowed to continue, exacerbate the very evils that the securities laws were designed to prevent. Indeed, the Securities and Exchange Commission, as *amicus curiae*, has advised us that the artificial demand created by purchasing securities which are not to be paid for unless the market value of the stock rises, can have an unsettling and potentially manipulative effect on the securities market—contrary to the very purpose of the Act." For similar reasons plaintiffs' instigation or willful participation in such violations would preclude their recovery by rescission under Section 29(b) of the Act (15 U.S.C.A. § 78cc). Cohen v. G. F. Rothschild & Co., CCH Fed.Sec.L.Rep. (Transfer Binder, 1957–61 Decisions) ¶ 90,849 (S.D.N.Y.1958). The issue of plaintiffs' participation in the statutory violations of the margin requirements presents a triable issue which cannot be determined by summary judgment.

### Stamm's Liability for its Employees' Conduct

▮▮▮▮▮ Plaintiffs' motion raises the additional question of the extent, if any, that Stamm is liable for the tortious conduct of its employees. In its affidavits Stamm claims that it provided proper supervision of its customers' accounts, setting forth specific procedures which, it alleges, were those adopted by stock brokerage firms of a similar size. Stamm further denies any knowledge of the violation of the federal securities laws or Regulation T by its employees. Two problems are presented upon this issue because the liability of Stamm for the actions of its employees may be determined under one or two theories. The first theory is based upon the provisions of Section 20 of the Act (15 U.S.C.A. § 78t), which provides that persons controlling persons liable under the Act are liable for the other person's actions "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." [5] The second theory rests upon the common law doctrine that a principal is liable for the acts of its agents acting within the scope of their employment or apparent authority. See, Restatement (Second), Agency, §§ 219 et seq. (1958). Without deciding under which theory plaintiffs may be entitled to recover,[6] it is sufficient to point out that the defendants' affidavits raise questions of fact under either theory; e. g., under the first theory, that they were acting in good faith, and under the second theory, that their employees as conspirators with the plaintiffs to defraud the employer were not acting with-

---

5. It is unnecessary under this section to establish common law relationship of principal and agent or employer and employee. In determining whether good faith was exercised, the Securities and Exchange Commission requires brokers to exercise careful and diligent supervision of office employees exposed to the public and to maintain and enforce a proper system of supervision and internal control. Reynolds & Co., et al., 39 SEC 902 (1960); R. H. Johnson & Co. v. SEC, 198 F.2d 690, 696–97 (2 Cir. 1952), cert. denied, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664.

6. See, Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968), and Lorenz v. Watson, 258 F.Supp. 724 (E.

D.Pa.1966), where courts predicated liability upon the controlling person section without discussing the common law master-servant doctrine. But see contra, Paul H. Aschkar & Co. v. Kamen & Co., CCH Fed.Sec.L.Rep. ¶ 91,565 (S.D.Cal. 1964), rev. 382 F.2d 689 (9 Cir. 1967), cert. granted, 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129 (1968), where the court denied liability under the controlling person theory but found liability under the master-servant doctrine. Which provision is applicable may depend upon whether the cause of action is predicated upon a statutory tort under the federal securities laws or upon a common law tort. See also, Note, Brokerage Firm's Liability for Salesman's Fraudulent Practices, 36 Fordham L.Rev. 95 (1967).

in the scope of their employment or apparent authority. It is axiomatic that conduct of an employee not for the purpose of serving the master is not within the scope of his employment (Restatement (Second), Agency, § 235 (1958); cf., Bushey & Sons, Inc. v. United States, 398 F.2d 167, 2 Cir., decided June 19, 1968), and also that one who conspires with an employee to defraud the employer cannot be said to rely upon the apparent authority of the employee's acts. Restatement (Second), Agency, § 219(2) (d).

### Class Action

■■■■■ The complaint alleges a class action on behalf of plaintiffs and others similarly situated, a device developed from the English equity practice by Judge Story to escape the strict rules of joinder of parties. See, 3A Moore, Federal Practice, ¶ 23.02 at pp. 3412–13 (2d Ed. 1968). Cf., Hazard, Indispensable Party: The Historical Origin of a Procedural Phantom, 61 Colum.L.Rev. 1254, 1259–60 (1961). "In our complex modern economic system where a single harmful act may result in damages to a great many people there is a particular need for the representative action * * *." Escott v. Barchris Construction Corporation, 340 F.2d 731, 733 (2 Cir. 1965), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965). One of the purposes of a class action is to provide a remedy for those who have been injured by a fraudulent course of conduct but who, because of their economic situation or ignorance, are unable to protect themselves by separate lawsuits. 3 Loss, Securities Regulation, supra, at 1824; Advisory Committee's Note, Rule 23, 39 F.R.D. 102–103; Kalven and Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 684, 686 (1941). The representative action provides a method for combining such claims and affording an effective remedy for violation of the federal securities laws (Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7 Cir. 1941)) and " * * *

it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" (J. I. Case Company v. Borak, supra, 377 U.S. at p. 433, 84 S.Ct. at p. 1560). In determining whether the procedural remedy of a class action is appropriate, it is necessary to carefully scrutinize its effect upon the interests of the absent members of the alleged class in order to protect their rights to due process. Hansberry v. Lee, 311 U.S. 32, 44, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

The pertinent sections of Rule 23 of the Federal Rules of Civil Procedure are 23(a) (1), which sets forth as a prerequisite that "the class is so numerous that joinder of all members is impracticable"; 23(b) (3), requiring a finding by the Court "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" and 23(c) (4), stating that when "appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

Plaintiffs claim that there are questions of law or fact common to the members which consist of a scheme and a common course of action by the defendants in inducing the members of the class to purchase and sell an excessive number of securities by misrepresentations and by agreements with respect to margin deposits and collateral in violation of the federal margin requirements. The class comprises persons who purchased and sold securities through the defendants' customers' man, Adolph Bennett, Jr., who in the course of their meetings at the broker's office became acquainted with other customers engaged in similar transactions with

Bennett. They list in their affidavits some twenty-five persons whom they believe fall within this class, alleging that there may be others known only to the defendants. They reason that while there may be some particular issues of fact which vary with each member, the existence of these issues should not render the class action inappropriate since the Court may divide the class into subclasses respecting the variations concerning these particular issues.

■■ For two reasons this action must be dismissed as a class action. The first is that the questions of law or fact which might be common to members of the class do not predominate over the questions which affect only individual members, so that a class action is not superior to other available methods for the fair and efficient adjudication of the controversy. Four theories of recovery have been suggested in the complaint, all of which, upon analysis, disclose individual factors inherent in the relationship between broker and customer involved in the various purchases and sales which might have been similar but not common to the members as a class. Class actions in securities cases are maintainable where there has been a standardized misrepresentation to a group through a prospectus, proxy statement, financial statements or form letter (Oppenheimer v. F. J. Young, & Co., Inc., 144 F.2d 387 (2 Cir. 1944)) or where the conduct of directors or trustees is alleged to defraud a group of security holders or common beneficiaries of the trust (Miller v. National City Bank of New York, 166 F.2d 723 (2 Cir. 1948)). In these cases the critical issues common to all members are the falsity of the representations and the defendant's knowledge in the former and breach of fiduciary duty in the latter. Such common issues as exist in this case do not fall within these categories.

As previously pointed out, liability for churning is predicated upon a breach of the fiduciary relationship arising from an abuse of the control of the account entrusted to the broker, which, among other things, depends upon the nature of the account, the transactions in the account and the understanding between the parties. There may be factors which are common to many in such relationship but there are also present individual and personal ingredients involved in the venture which differ with respect to each person transacting business with the broker. A reading of the churning cases illustrates the personal character of most of the contacts involved in this tort. Similarly, individual issues are predominant in the claims arising out of the violation of the margin requirements. While it is admitted that insufficient margin was maintained in the accounts, the existence or nonexistence of participation on the part of the customer in the violation is a critical issue. This depends upon the sophistication of the customer and the nature of his connection with the broker, which must be established in each case before liability may be assessed. With respect to these two theories, such questions of law or fact that may be common to the class obviously do not predominate over those affecting each individual.

The charge of oral misrepresentations and breach of oral agreements are in the same category as the above theories. The misrepresentations and agreements might have been similar with respect to all members of the class, but they were not standardized in the same sense as standardized misrepresentations appearing in a prospectus, financial statements and advertisements and standardized agreements appearing in written documents. See, Fischer v. Kletz, 41 F.R.D. 377, 382 (S.D.N.Y.1966). Although having some common similarities, these face to face oral misrepresentations are individualized and susceptible of material variations, particularly in view of the disparities in the financial condition of each member. Such differences are not

the type of variations which are inherent in the garden variety of securities class actions. Cf., Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D. N.Y.1966).[7]

In sum, non-common issues in all these theories are inextricably entangled with the common issues. For this reason, there is no foundation under any theory of recovery for a division of issues into separate categories for class action purposes as permitted by Rule 23(c)(4). Nor have the plaintiffs brought themselves within that line of cases where there is a common course of conduct separable from other relevant questions, such as identical misrepresentations to a class in a fraud action wherein the issue of the common misrepresentation may be separately tried from the issue of reliance. A distinction is to be made between a course of conduct interwoven with many similarities and dissimilarities from which a design, common to all members of the class emerges and a course of conduct with no such dissimilarities which *per se* is common to all members of the class.

The second reason for dismissal as a class action is the size of the class. The complaint falls short of setting forth a class which "is so numerous that joinder of all members is impracticable". Plaintiffs say that they know twenty-five persons who will be included in the class and that they believe there may be others known only to the defendants. With such a relatively small number, intervention is feasible and will offer each member an opportunity to prosecute his own claim without being subject to the risk that the representative parties might not fairly and adequately protect his interest. Nor should there be, judging from the complaint and affidavits, any geographical or jurisdictional problems presented by such intervention. Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2 Cir. 1944); Hunter v. Southern Indemnity Underwriters, Inc., 47 F.Supp. 242 (E.D.Ky.1942); Hirschi v. B. & E. Securities, Inc., 41 F.R.D. 64 (D. Utah 1966). Joinder has been held preferable where the number of prospective members lies between 30 and 40. See, Atwood v. National Bank of Lima, 115 F.2d 861 (6 Cir. 1940); Phillips v. Sherman, 197 F.Supp. 866, 869 (N.D.N.Y.1961).

While the action is not suitable for a class action under Rule 23, it is the type of suit where permissive intervention by the other members of the class pursuant to Rule 24(b) is available. Carroll v. American Federation of Musicians of United States & Canada, 33 F.R.D. 353 (S.D.N.Y.1963). The utilization of this device, coupled with appropriate discovery proceedings, offers the most appropriate method of fairly adjudicating the interests of all affected parties.

It is therefore ordered that plaintiffs' motion for a partial summary judgment be denied and that defendants' motion to dismiss the action as a class suit be granted.

7. The Advisory Committee has observed: "In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Advisory Committee's Note, Rule 23, 39 F.R.D. at 103. See also, 3 Loss, Securities Regulation, supra, at 33 (1962 Supp.).