Delfino P. MASCOLO and Jeanne J. Mascolo, individually and as representatives of a class, Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Defendant.

No. 72 Civ. 3292 HRT.

United States District Court, S. D. New York.

Dec. 6, 1973.

R. Alan Stotsenburg, New York City, for plaintiffs.

Brown, Wood, Fuller, Caldwell & Ivey, by Richard Conway Casey and Henry F. Minnerop, New York City, for defendant.

TYLER, District Judge.

Plaintiffs Delfino and Jeanne Mascolo began this suit against Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") on August 2, 1972, seeking relief for defendant's alleged violations of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78a et seq. On July 6, 1973, this court denied defendant's motion to transfer the action pursuant to 28 U.S.C. § 1404(a) to the Northern District of Texas where a similar action against Merrill Lynch was pending. Mascolo v. Merrill Lynch, Pierce, Fenner & Smith Incorporated, Civil No. 72-3292 (S.D.N.Y., filed July 6, 1973). At issue here, is a motion for an order pursuant to Rule 23, F.R.Civ. P., that this litigation proceed as a class action. For the reasons hereinafter stated, any decision on plaintiffs' motion must be held in abeyance pending the development of an adequate factual background.

Plaintiffs' suit is brought under § 27 of the Act, 15 U.S.C. § 78aa. They claim that defendant's conduct violated the following provisions of the Act and the Rules promulgated thereunder: § 10(b), 15 U.S.C. § 78j(b) and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5; § 15(c)(1), (2), and (3) of the Act, 15 U. S.C. § 78o(c)(1), (2), (3) and SEC Rule 15c1–2, 17 C.F.R. § 240.15c1–2; § 11(d)(2), 15 U.S.C. § 78k(d)(2) and SEC Rules 15c1–4 and 15c1–6, 17 C.F.R. §§ 240.15c1–4, 15c1–6. According to

plaintiffs, the facts upon which they base these claims are as follows.

On the evening of August 13, 1969, Dr. Mascolo received a call from Louis J. Battista, the account executive who serviced the Merrill Lynch account of his wife.[1] Dr. Mascolo stated that Mr. Battista recommended the purchase of shares of the Scientific Control Corporation ("SCC") and, in response to a specific question, told him that the recommendation came from the Merrill Lynch research department. On the following day, August 14, Dr. Mascolo instructed Mr. Battista to purchase two hundred shares of SCC, which purchase was duly executed.[2] The total purchase price was $6,168.50. According to Dr. Mascolo, Mr. Battista did not inform him that Merrill Lynch was acting as a principal in this transaction; that Merrill Lynch was making a market in SCC stock; and that because of a present or potential investment banking relationship with SCC, Merrill Lynch might in the future be prevented from passing on to plaintiffs material adverse information concerning SCC.

After Dr. Mascolo purchased the stock, the market price of SCC declined. This decline became especially marked after it was announced on October 15, 1969, that SCC had been denied a $3,500,000 loan and, on November 21, 1969, that SCC had filed a petition under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., for an arrangement. Plaintiffs allege that the shares of SCC are now practically worthless.

Plaintiffs seek to define the purported class as all customers of Merrill Lynch who purchased SCC common stock during the market period commencing March 1, 1968 and ending October 16, 1969.[3] There would seem to be between

---

1. The information concerning the individual transaction of the Mascolos is contained in Delfino P. Mascolo's affidavit of May 30, 1973.

2. Dr. Mascolo apparently had a power of attorney over his wife's account, and the purchases were made for that account.

3. In plaintiffs' amended complaint, the period in question covered purchases from March 1, 1968 to November 10, 1969, but this period was shortened in counsel's affidavit. Stotsenburg affidavit of April 23, 1973, ¶ 6.

four and ten thousand members of the class. According to plaintiffs, from March 1, 1968 to June 2, 1968, the Merrill Lynch research department issued recommendations to purchase SCC shares and hold them for long term investment. For the period from June 3, 1968 to December 16, 1968, these recommendations were changed, and it was suggested that SCC stocks not be bought but that any SCC stock already purchased, be held and not exchanged. The basic recommendation was changed again for the period from December 17, 1968 to October 15, 1969, and the original opinion of buy and hold was reinstated. In addition, plaintiffs also allege that during the market period the research department issued two "wire flashes" on December 17, 1968 and June 9, 1969, and that these wire flashes were distributed to all Merrill Lynch account executives and to members of the investing public.

The research opinions of Merrill Lynch were disseminated by means of a computerized opinion retrieval system called "QRQ". The research opinions, known as "QRQ opinions", are put into the QRQ system and are instantly available to Merrill Lynch salesmen anywhere in the world. These opinions are reviewed and updated about every ten days and, according to plaintiffs, during the period of time in question Merrill Lynch issued twenty-six opinions concerning SCC stock.

In Count 1, plaintiffs claim that Merrill Lynch had no reasonable basis for its optimistic recommendations concerning SCC and that it failed to adequately supervise the activities of its employees who were promoting the sale of SCC. In Count 2, it is alleged that at some time during the marketing period Merrill Lynch received, or should have received, actual notice of material adverse facts about SCC which it failed to dis-

close to the investing public. More specifically, it is claimed that by August 12, 1969, the underwriting department of Merrill Lynch had learned of information which caused it to refuse a private placement of SCC securities. In their third and final count, plaintiffs attack the failure of Merrill Lynch to disclose that it made a market in SCC shares and acted as a dealer for its own account.

Rescission of the contracts to purchase SCC stock are sought; alternatively, plaintiffs seek damages of $32,000,000, or an accounting of all profits which would then be paid over to plaintiffs' class. Attorneys' fees are also requested.

In order to qualify for class action treatment, the proposed class must meet the requirements enumerated in F.R.Civ.P. 23. The requirements which must be given special attention in this case are F.R.Civ.P. 23(a)(3) and 23(b)(3). 23(a)(3) provides that the plaintiffs' claims must be found to be "typical of the claims . . . of the class." F.R.Civ.P. 23(a)(3). In addition, the court must find that:

"[t]he questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." F. R.Civ.P. 23(b)(3).[4]

From the facts in its possession, this court is unable to determine at present whether these requirements have been met.

To put it briefly, the argument against granting plaintiffs' request for a class action is that the issues of misrepresentation and reliance will necessarily require separate determinations of fact for each of the individuals in the purported class. If this were so, the

4. Although F.R.Civ.P. 23(a)(3) and 23(b)(3) are discussed together, this court does not mean to find that the two requirements are identical.

common issues of law would become only a minor part of this litigation. In this particular case, however, it may be possible to avoid separate factual determinations, at least as to certain aspects of the case.

■ In their attempt to establish a common theme in this action, an initial problem which plaintiffs must confront is the fact that the QRQ opinions varied continuously during the market period in question. Plaintiffs have admitted that there were twenty-six separate opinions concerning the SCC stock during this period. Plaintiffs have alleged, however, that in all these opinions there was a common misrepresentation, namely that SCC stock was "suitable for growth". Plaintiffs' proposed findings on class action motion, ¶ 12. Nevertheless, the differences in the QRQ opinions would seem to have been significant as is witnessed by the fact that the basic recommendation of Merrill Lynch was changed during this period from "BUY/HOLD" to "DON'T BUY/HOLD/NOT OK TO EXCHG" and then back to "BUY/HOLD". Kenny Affidavit Exhibit A. Moreover, defendant has argued that the research department responded to individual inquiries by account executives. At this stage in the litigation, the court is not in a position to hold that the variations in the representations made to customers require that class action status be denied or that subclasses be created. As was pointed out by this court in Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966), where different statements are linked together by a common course of conduct, a proper class may include persons who received different representations at different times. See, also Green v. Wolf Corporation, 406 F.2d 291, 299–300 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969); Dolgow v. Anderson, 43 F.R.D. 472, 489 (E.D.N.Y.1968); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S. D.N.Y.1966); 3B Moore's Federal Practice, ¶ 23.45(2) at p. 23–765–767. If the difference in content of the representations is found material, this court has the power to handle that issue at a later stage in this litigation. Vernon J. Rockler & Co. v. Graphic Enterprises Inc., 52 F.R.D. 335, 345 (D.Minn.1971).

Defendant has argued forcefully that this case is inappropriate for class action treatment because the representations in question were made orally by different account executives. If the issue of what each account executive said to each purchaser of SCC stock during the market period must be argued separately for each member of the class, it seems clear that class action status should not be granted since individual questions will predominate over common questions. This would be true even if a common core of fraud and common issues of law were found. For this reason, the courts have refused to permit class actions where oral misrepresentations have been involved. Simon v. Merrill Lynch, Pierce, Fenner & Smith, Incorporated, 482 F.2d 880 (5th Cir. 1973); Skydell v. Mates, 59 F.R.D. 297 (S.D.N.Y.1972); Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y.1971); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y. 1968). But, see Vernon J. Rockler & Co. v. Graphic Enterprises, Inc., supra, 52 F.R.D. at 344. An analysis of the above cited cases, however, suggests that the circumstances of those cases were such, that the fact that class action motions were denied therein does not necessarily preclude this court from granting plaintiffs' motion.

In the related case of Simon v. Merrill Lynch, Pierce, Fenner & Smith Incorporated, supra, the court was confronted with an issue concerning oral misrepresentations similar to the one before this court. The court denied the motion for a class action order. The court, however, rested its holding in part on the fact that plaintiffs were in a special position in that they had "personal access to, if not information about, SCC's fi-

nancial condition." (*Id.* 482 F.2d at 883). The plaintiffs' pleadings in *Skydell, supra,* were so defective that no specific instance of misrepresentation to the plaintiff or his class was even set forth. In *Morris, supra,* twelve different oral representations were alleged, but there was no indication that any of those statements were brought to the attention of all the members of the class. Furthermore, no common course of conduct was found.

In the *Moscarelli* case, *supra,* the court opined that, in order for class action status to be granted, misrepresentations must not only be similar but also standardized, as in the case of a prospectus, financial statement, or advertisement in a written document. (*Id.* 288 F.Supp. at 462) The notes of the Advisory Committee on the 1966 amendment to F.R.Civ.P. 23 state, however, that a class action is proper where the misrepresentations used to perpetuate a fraud are "similar", 39 F.R.D. at 103. Moreover, as has been indicated above, misrepresentations need not be standardized if they were put forth pursuant to a common scheme. The court also found in *Moscarelli* that the misrepresentations were susceptible to material variations. (*Id.* 288 F.Supp. at 462). In the instant case, this issue is still to be decided.

Plaintiffs here have alleged that the account executives were, in effect, the mere mouthpieces of the Merrill Lynch research department and that they performed very little independent research on their own. If this is shown, then the problem of varying misrepresentations would be minimized. No separate inquiry into the issue of what each account executive said to each customer would be required since the statements could be presumed to be mere reiteration of the latest Merrill Lynch QRQ opinion.

■ On the basis of the present evidence, this court is unable to determine to what extent the representations made by the account executives differed from the recommendations of the research department. This question is important because it goes to the issue of reliance. In order for the plaintiffs to recover, it must be shown that they relied on the representations or omissions of Merrill Lynch, and in order for the class action motion to be granted, these representations must be shown to be similar. This does not mean that plaintiffs must indisputably prove that the account executives merely parroted the QRQ opinions, but it does mean that a showing must be made that the practice of the account executives, essentially, was to convey to the customers the opinions of the Merrill Lynch research department.

It is suggested that the parties submit evidence to this court on the issues of whether it was the practice of account executives to pass on to their customers the recommendations of the Merrill Lynch research department in substantially unchanged form and whether or not they passed on additional unrelated material information concerning SCC stock. Specifically, it is suggested that the plaintiffs take the deposition of six account executives on these issues and submit those depositions to the court. It might be wise for plaintiffs to ask the account executives whether or not they knew that Merrill Lynch was making a market,[5] or was a principal, in SCC and, if so, whether or not they informed their customers of these facts. It would also be useful for this court to know how many account executives sold SCC stock to members of the putative class during the market period in question. On the issue of whether or not the purchase confirmation slip met the requirements of Rule 15c1–4, the court would appreciate some evidence that the confirmation slip sent to plaintiffs was

---

5. The fact that it was noted on the wire flashes that "Merrill Lynch usually makes a market in this issue" might have some bearing on this point.

similar to those sent to the other members of the purported class.

It could be argued that, even if similar statements by the account executives were established, the individual questions of reliance would still predominate over the issues common to the class. Indeed, in *Simon, supra,* one of the reasons why the court refused to permit the plaintiff to act as a representative of the class was that the plaintiff in that case did not rely on the broker's advice. (*Id.* 482 F.2d at 884). The district court, however, had found specifically that the plaintiff had access to other sources of information upon which he relied. There is no evidence in the instant case that plaintiffs had any such information. If it is established that the alleged misrepresentations were material, it may well be that reliance can be presumed without the necessity of individual trials. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, 480 F.2d 341, 374 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973); Kahan v. Rosensteil, 424 F.2d 161 (3d Cir.), cert. denied 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). Even if it is determined that, at least as to certain members of the class, reliance should be tried on an individual basis, it may still be possible to order separate trials at a later date. Green v. Wolf Corporation, supra; Weiss v. Tenney Corporation, 47 F.R.D. 283 (S.D.N.Y.1969); Fogel v. Wolfgang, 47 F.R.D. 213 (S.D.N.Y. 1969); Mersay v. First Republic Corporation of America, 43 F.R.D. 465 (S.D. N.Y.1968); M. Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39 (1967); Comment, Reliance Upon Rule 10b–5: Is the "Reasonable Investor" Reasonable?, 72 Colum.L.Rev. 562, 577–79 (1972); but see Morris v. Burchard, *supra.*

Plaintiffs have stated that Merrill Lynch knew or should have known that SCC was not a good stock for investment purposes and that it omitted to inform its customers of this fact.[6] As in so many other matters, however, plaintiffs have been vague and inconsistent in their allegations of at what point Merrill Lynch obtained this information. It is not enough to allege that Merrill Lynch learned or should have learned[7] of adverse information "no later than August 12, 1969." Plaintiffs' Amended Complaint ¶ 30. If Merrill Lynch did not learn of adverse information until August 12, 1969, the class of customers allegedly defrauded by the omission of Merrill Lynch to state a material fact would be only a subclass of the customers who purchased stock during the proposed market period.

The question of at what point Merrill Lynch was responsible for a material omission also goes to the issue of whether or not plaintiffs' claims are typical of the claims of the class. As has been discussed heretofore, it is possible that a number of subclasses may be necessary; indeed, it could be argued that the Mascolos themselves belong in one such subclass, to wit, that subclass which bought on the basis of material omissions subsequent to August 13, 1969.

Until this court is given more information concerning at what point Merrill Lynch breached its duty by omitting to inform its customers of adverse facts,

6. Interestingly enough, if plaintiffs can succeed on their first count concerning Merrill Lynch's allegedly overly optimistic recommendations, there will be no need to prove omissions of adverse information concerning the investment value of SCC stock.

7. This court expresses no view here as to the degree of scienter necessary to establish a violation of the securities laws. Cf. Cohen v. Franchard Corporation, 478 F.2d 115 (2d Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973). It is also unnecessary to reach the issue of whether or not Merrill Lynch had an obligation to disclose any information it obtained in its capacity as an underwriter or potential underwriter.

no decision as to the appropriateness of class action status on this issue can be reached.

 To recapitulate, this court will hold in abeyance any decision on whether or not class action status should be granted. It is suggested that further evidence be submitted on the issues of the role played by Merrill Lynch account executives in the sale of SCC stock; the nature of the confirmation slip sent out; and the date after which Merrill Lynch failed to pass on to its customers adverse information concerning SCC stock.

It is so ordered.