MORGAN, OLMSTEAD, KENNEDY & GARDNER INCORPORATED, Moseley, Hallgarten, Estabrook & Weedon Inc., and Securities Settlement Corporation, Plaintiffs,

v.

Victor SCHIPA (a/k/a Vittorio Schipa), Girard Wilde & Co., Inc., and Carlisle Institutional Services, Inc., Defendants.

No. 82 Civ. 8067 (WCC).

United States District Court, S.D. New York.

April 13, 1984.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for plaintiff Morgan, Olmstead, Kennedy & Gardner, Inc.; Gary P. Naftalis, New York City, of counsel.

Shearman & Sterling, New York City, for plaintiff Moseley, Hallgarten, Estabrook & Weedon Inc.; John Klug, New York City, of counsel.

Gaston, Snow, Beekman & Bogue, New York City, for plaintiff Securities Settlement Corp.; Alice F. Chen, New York City, of counsel.

LaRossa, Axenfeld & Mitchell, New York City, for defendants; Thomas S. Finnegan, Brooklyn, N.Y., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiffs Morgan, Olmstead, Kennedy & Gardner, Incorporated ("Morgan Olmstead"), Moseley, Hallgarten, Estabrook & Weedon, Inc. ("Moseley"), and Securities Settlement Corporation ("SSC") commenced the instant action seeking to recover losses of approximately $4,100,650 which they allege they suffered as a consequence of defendants' fraudulent conduct. They assert a claim under § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, as well as a pendent claim for common law fraud. Although defendants Girard Wilde & Co. ("Girard Wilde") and Carlisle Institutional Services, Inc. ("Carlisle") deny plaintiffs' allegations, they also raise certain other issues in response to the complaint, including affirmative defenses of failure to mitigate damages and *in pari delicto*, and a counterclaim alleging a right of set off against plaintiffs based alternatively upon their active participation in or their negligent failure to discover the fraud.[1]

The case is currently before the Court on plaintiffs' motion to strike these two defenses and to dismiss the counterclaim on the ground that each is insufficient as a matter of law. For the reasons stated below, the motion is granted.

### I.

Plaintiffs' complaint sketches an intriguing tale of surreptitious dealing by defendants, whereby each of the plaintiffs was caused to form a fundamentally different, and inaccurate, view of the nature of the securities transaction in which all were

---

1. The third defendant Victor Schipa ("Schipa") invoked his constitutional and other rights not to incriminate himself in response to the allegations of the complaint.

participating. The allegations of the complaint are as follows:

Defendant Victor Schipa ("Schipa") had been an active securities customer at Moseley since approximately 1977. (Complaint at ¶ 11). In late 1981, Schipa established Girard Wilde, and on January 4, 1982, he opened two non-discretionary securities accounts at Moseley for Girard Wilde. (Complaint at ¶¶ 12–13). One was a regular account, while the other was established to buy and sell on a "delivery against payment" or "DVP" basis.[2] (Complaint at ¶ 14). Schipa described Girard Wilde to Moseley as a new firm that expected to engage in a high volume of purchases and sales of securities for its own account. (Complaint at ¶ 13).

From approximately February 11, 1982 until July 13, 1982, Schipa engaged in numerous DVP transactions through Moseley on behalf of Girard Wilde. In connection with each of these transactions, Schipa instructed Moseley to cause stock to be transferred to or from the United States Trust Company ("U.S. Trust"), as Girard Wilde's agent. (Complaint at ¶ 17). At the time, Moseley had a contractual arrangement with SSC, whereby SSC performed the necessary clearing services for securities transactions on behalf of Moseley's customers. (Complaint at ¶ 16). Accordingly, Moseley directed SSC to carry out the transactions with U.S. Trust in conformance with Schipa's instructions. (Complaint at ¶ 17).

In late July of 1982, Schipa represented to Moseley that Morgan Olmstead had replaced U.S. Trust as Girard Wilde's DVP agent. From that point until October 15, 1982, Moseley caused SSC to carry out transactions with Morgan Olmstead in accordance with DVP orders placed by Schipa for the account of Girard Wilde. (Complaint at ¶ 18).

Although Moseley and SSC did not know it at the time, Morgan Olmstead had not agreed to act as Girard Wilde's DVP agent. Instead, Morgan Olmstead believed that it was engaging in stock loan transactions[3] arranged by defendants as finders. (Complaint at ¶ 19).

During the fourteen-month period prior to August 1982, Schipa and Carlisle had acted regularly as finders in arranging loans of securities from Morgan Olmstead to other institutions. (Complaint at ¶ 22). In the summer of 1982, Schipa represented to Morgan Olmstead that defendants were in a position to arrange for a substantial volume of securities loans to a New York brokerage firm, subsequently identified as SSC, and Morgan Olmstead agreed to recognize Girard Wilde or Carlisle as a finder for any such loans that were actually arranged. (Complaint at ¶ 23).

Thus, based upon defendants' false representations, Morgan Olmstead understood that it was engaging in stock loan transactions with SSC and Moseley. At the same time, based upon other false representations by defendants, SSC and Moseley be-

**2.** According to plaintiffs, in a DVP purchase transaction, the broker purchases securities for the customer's account, and prior to settlement delivers them to another institution, with which the customer has made prior arrangements, against receipt of an amount of cash specified by the customer, which the broker applies to cover the purchase. In a DVP sale transaction, the broker sells securities for the customer's account, then in order to settle the sale receives similar securities from another institution, by prior arrangement of the customer, against payment of an amount of cash specified by the customer. (Complaint at ¶ 15).

**3.** According to plaintiffs, a securities loan transaction involves a loan of securities from one institution to another. The borrower places cash collateral with the lender for the full value

of the securities and the lender pays the borrower interest on the cash at an agreed rate. The finder's commission is determined by the spread between the interest rate that the lender agrees to pay and the rate that the borrower agrees to accept. Upon the expiration of the loan, the borrower returns the securities to the lender and the lender returns the cash collateral to the borrower. (Complaint at ¶ 21). Defendants add that in the normal loan transaction, if the market value of the securities rises or falls during the term of the loan, one of the brokers will issue a "mark to market" notice informing the other side that either more cash is required to collateralize fully the loan or cash has to be returned to reflect a drop in price. *See* Def. Brief at 2–3.

lieved that they were involved in DVP transactions with Morgan Olmstead. (Complaint at ¶ 26). In the course of these transactions, Morgan Olmstead made periodic payments to defendants of interest it believed it owed to SSC and fees it believed it owed to defendants for arranging the transactions. (Complaint at ¶ 25). As of October 22, 1982, Morgan Olmstead's books showed open loans of stock to SSC having a market value of approximately four million dollars in excess of cash collateral. It was at this point that Morgan Olmstead demanded of SSC, for the first time, additional collateral or return of stock, and was informed by SSC that it had no records of loans from Morgan Olmstead and that all stock previously received had been sold for Girard Wilde's account. (Complaint at ¶ 27).

The counterclaim and the affirmative defenses of failure to mitigate damages and *in pari delicto* asserted by defendants Girard Wilde and Carlisle are all based upon actions by plaintiffs which allegedly evince their assistance in or negligent disregard of any fraud that may have been practiced by defendants. Specifically, defendants contend that if plaintiffs had adhered to their ordinary business practices or exercised reasonable diligence, the fraud alleged in the complaint could not have occurred. Among the improper acts or omissions recited by defendants is Morgan Olmstead's failure to send out "mark to market" notices as the price of the loaned stock increased. Moreover, defendants point to specific evidence, obtained through discovery, that persons at SSC, Moseley's clearing agent, were repeatedly notified and were aware that they were engaged in stock loan transactions, but that they ignored such notification and continued to treat the loans as though they were normal sale transactions.

## II.

The theory underlying the affirmative defense of failure to mitigate damages is, as expressed by defendants, in all material respects consistent with the basis for liability asserted in their counterclaim: that plaintiffs' own actions are wholly or partially responsible for any injuries they may have suffered as a result of the transactions at issue here. It is clear, however, that to the extent the defense and counterclaim are grounded upon plaintiffs' negligent conduct, they are insufficient as a matter of law.

■ Even assuming that plaintiffs acted without reasonable care in conducting their business activities, it is well established that such contributory negligence cannot be raised as a defense to a claim for intentional fraud, as is alleged by plaintiffs in this action. *See United States v. Hero,* 78 Civ. 4587, slip op. at 11, c n. 5 (S.D.N.Y. July 27, 1981) (Conner, J.); *United States v. Kates,* 419 F.Supp. 846, 854 (E.D.Pa. 1976); Restatement (Second) of Torts §§ 481, 545A (1977); *see also Wager v. Pro,* 603 F.2d 1005, 1011 (D.C.Cir.1979) (defense of last clear chance applies only to negligent torts and not to intentional torts). Carlisle and Girard Wilde do not contend that plaintiffs' negligence should serve as an automatic and complete bar to recovery here but as a basis for reducing the damages that might otherwise be recoverable as a consequence of any fraud that is ultimately proven.

■ On this point, there can be no dispute with the general principle that one who fails to avoid the consequences of a tort is disabled from recovering those damages which he could reasonably have avoided. *See, e.g., Pearlstein v. Scudder & German,* 527 F.2d 1141, 1145 (2d Cir.1975); C. McCormick, Damages § 33 at 127 (1935). As explained by Dean McCormick, this rule restricts the limits of liability for reasons of social and economic policy designed to protect and conserve the welfare and prosperity of the community as a whole. *See id.* at 127–28; *see also Tatum v. Morton,* 386 F.Supp. 1308, 1311 (D.D.C.1974). Thus, where one receives actual knowledge that he has been injured as a result of another party's fraudulent conduct, he will be disabled from recovering for injuries occurring thereafter which he could have

avoided in the exercise of reasonable diligence. *See* Restatement (Second) of Torts § 481 at comment c. Such a result obviously comports with the social policies underlying the mitigation of damages rule in that it discourages the needless accumulation of damages that can reasonably be avoided, and it also has the common-sense effect of preventing recovery for "wounds which in a practical sense are self-inflicted." *Tatum*, 386 F.Supp. at 1311.

■ Carlisle and Girard Wilde seek to expand this principle in the instant case to cover a situation where plaintiffs' negligence delayed discovery of the alleged fraud and therefore allowed damages to continue to grow. Defendants' arguments on this motion and the nature of their discovery requests demonstrate that their mitigation of damages defense and their counterclaim are based primarily upon plaintiffs' failure to discover prior to late October of 1982 that a fraud had occurred. However, there is no justification for allowing them to raise this issue in response to plaintiffs' claims of an intentional tort.

In the fraud alleged in this action, as in all intentional frauds, one party has knowingly deceived the other party, and purposely exploited a weakness in the other's method of operation for his own gain. No social value would be served by allowing a defendant to assert the very weakness he has exploited as a ground for limiting the defrauded party's claim against him for damages. Instead, it would merely insulate one who has committed an intentional, antisocial act from accounting to the person he has injured for all of the consequences flowing from that act, and thus might have the undesired secondary effect of promoting fraudulent activity.

If defendants' mitigation theory in this case were legally cognizable, then in every churning case, for example, the defendant broker could raise, as a ground for limiting the plaintiff's recovery, a defense that had the defrauded investor given his securities account as much attention as a reasonable investor would have, he would have discovered earlier that the broker was engaging in excessive and inappropriate trading, and thus would have been able to limit the commissions generated by the broker. The defense raised by Carlisle and Girard Wilde is analogous to this churning example. In both, the defendant is in essence saying that "because your negligence allowed me to defraud you or to continue to defraud you, you should not be allowed to recover from me to the extent that a reasonable person would not have allowed me to defraud him." Such a defense is patently unfair and unjustifiable as a matter of law. *Cf.* Restatement (Second) of Torts § 545A, comment a (one who relies upon fraudulent misrepresentation not required to exercise care of reasonable man for own protection).

■ Moreover, defendants' suggestion that plaintiffs "actively participated in" the fraud fares no better as support for the counterclaim or the mitigation defense. It is obvious that no fraud can take place without the participation of the victim. But the suggestion that the victim thus becomes one of the perpetrators of the fraud is frivolous. The very ignorance which renders the victim vulnerable to the fraud also deprives him of the necessary *mens rea* to be a conspirator. Of course, to any extent that defendants can show that they revealed to a plaintiff the true nature of the transactions in which they were involved, defendants will have presented a complete defense to that plaintiff's charge of fraud.

### III.

■ Turning to the *in pari delicto* defense, the Second Circuit has noted that the doctrine is not looked upon with great favor as a defense to securities claims. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 75 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). In order to succeed with this defense, a defendant must establish that: (1) the plaintiff's wrongdoing is connected with the subject matter of the litigation; (2) the defendant was injured by the plaintiff's wrongful conduct; and (3) the misconduct of the plaintiff and the defendant must be

equal in magnitude. *See id.* at 75–76. Moreover, in a securities case, the defense will not be allowed where it will interfere with the implementation of important features of the regulatory scheme or where it will have a negative impact on the investing public. *See Lawler v. Gilliam,* 569 F.2d 1283, 1292 (4th Cir.1978); *Fogarty v. Security Trust Company,* 532 F.2d 1029, 1033 (5th Cir.1976); *see also Mallis,* 615 F.2d at 76 n. 6.

Even assuming defendants' success in uncovering everything they say they hope to uncover through further discovery and ultimately to demonstrate at trial, their *in pari delicto* defense remains insufficient as a matter of law. Although the defense articulated by Carlisle and Girard Wilde arguably satisfies the first *Mallis* requirement, it nevertheless fails to meet the second and third elements of the test. In addition, it is inconsistent with the regulatory scheme underlying the antifraud provisions of the securities laws.

■ I am at a loss to divine how plaintiffs' conduct, under any of the scenarios postulated by defendants, caused injury to any of the defendants. If plaintiffs' wrongful conduct was their negligent failure to discover the fraud, the consequence of that failure was that defendants were able to continue defrauding plaintiffs. Surely this does not constitute an injury to defendants. Moreover, if, as defendants allege, several of plaintiffs' employees had knowledge of the true nature of the transactions, defendants will either have presented a complete defense to the merits of plaintiffs' claim or have demonstrated that some of plaintiffs' employees were part of the fraudulent scheme. In the former situation, the *in pari delicto* defense is inappropriate and unnecessary since defendants will have defeated plaintiffs' claim of fraud. In the latter instance, the conduct of plaintiffs' employees did not injure defendants, but assisted defendants in carrying out the alleged fraud. In any event, in this second situation the knowledge of the employees who participated with defendants in the fraudulent scheme

will not be imputed to plaintiffs. As one court has stated:

> It is axiomatic that conduct of an employee not for the purpose of serving the master is not within the scope of his employment ..., and also that one who conspires with an employee to defraud the employer cannot be said to rely upon the apparent authority of the employee's acts.

*Moscarelli v. Stamm,* 288 F.Supp. 453, 461 (E.D.N.Y.1968) (citations omitted).

■ Similarly, it is impossible under any of the theories posited by defendants to find that plaintiffs' misconduct was equal in seriousness to defendants' improprieties. If plaintiffs' misdeed was its negligent failure to prevent and uncover the fraud, the degree of culpability involved in such conduct does even remotely approach the reprehensible nature of the intentionally fraudulent activities of which defendants are accused. Alternatively, if it is proven that any of plaintiffs' employees were participants in defendants' fraudulent scheme, that misconduct will not, as noted above, be attributed to plaintiffs themselves. In addition, to the extent that defendants are able to show that they did not fraudulently misrepresent the nature of the securities transactions to plaintiffs, defendants will successfully have defeated plaintiffs' cause of action and thus will have obviated the need for an *in pari delicto* defense.

■ Finally, there can be no doubt that allowing an *in pari delicto* defense in the instant case will directly undermine the policies embodied in the antifraud provisions of the federal securities laws. Although, as defendants point out, plaintiffs are admittedly not unsophisticated investors, the protections of the securities laws stretch beyond the limited class of novice traders. Rather, one of the primary purposes of § 10(b) is more generally the protection of the integrity of the securities markets. *See Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971); *United States v. Chiarella,* 588 F.2d 1358, 1365 (2d Cir.1978), *rev'd on other grounds,* 445

U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). This purpose would be severely compromised if courts were to allow the equitable *in pari delicto* defense to a claim for intentional fraud—the paradigmatic conduct at which the securities laws are directed—at least in cases where the plaintiff and defendant did not have a conspiratorial relationship. *Cf. Mallis*, 615 F.2d at 76 n. 6 (all cases approving *in pari delicto* defense in securities context look to conspiratorial or quasi-conspiratorial relationship between parties, relatively equal culpability between parties, and enforcement policies of securities acts). The instant action simply does not present the rare situation in which recognition of the *in pari delicto* defense would be appropriate.

### IV.

For the reasons stated above, plaintiffs' motion to strike the affirmative defense of *in pari delicto* and to dismiss defendants' counterclaim is granted. Plaintiffs' motion to strike the mitigation of damages defense is also granted to the extent that the defense concerns plaintiffs' actions prior to their actual discovery of the alleged fraud. Defendants will be limited to discovery of matters relevant to the issues remaining in this action, as narrowed by this Opinion and Order.

SO ORDERED.