RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNION PLANTERS BANK, N.A., now known as
REGIONS BANK,
      *Plaintiff-Appellant/Cross-Appellee,*

    *v.*

CONTINENTAL CASUALTY CO.,
      *Defendant-Appellee/Cross-Appellant,*

NATIONAL UNION FIRE INSURANCE CO.; ST. PAUL
MERCURY INSURANCE CO.; and TWIN CITY FIRE
INSURANCE CO.,
      *Defendants-Appellees.*

Nos. 05-6094/6095

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 02-02321—Samuel H. Mays, Jr., District Judge.

Argued: December 5, 2006

Decided and Filed: February 27, 2007

Before: SUTTON and GRIFFIN, Circuit Judges; COHN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Douglas A. Black, WYATT, TARRANT & COMBS, Memphis, Tennessee, for
Appellant. Jeffrey S. Price, MANIER & HEROD, Nashville, Tennessee, H. Frederick Humbracht,
Jr., BOULT, CUMMINGS, CONNERS & BERRY, Nashville, Tennessee, for Appellees.
**ON BRIEF:** Douglas A. Black, Thomas R. Dyer, WYATT, TARRANT & COMBS, Memphis,
Tennessee, for Appellant. Jeffrey S. Price, John M. Gillum, Sam H. Poteet, Jr., MANIER &
HEROD, Nashville, Tennessee, H. Frederick Humbracht, Jr., BOULT, CUMMINGS, CONNERS
& BERRY, Nashville, Tennessee, Michael Keeley, John R. Riddle, STRASBURGER & PRICE,
Dallas, Texas, Michael G. McLaren, Vickie Hardy Jones, BLACK, McLAREN, JONES &
RYLAND, Memphis, Tennessee, for Appellees.

_____

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by
designation.

---

**OPINION**

---

SUTTON, Circuit Judge. Union Planters Bank suffered a multi-million-dollar loss stemming from a mortgage lender's fraud. Upon discovering the fraud, the bank notified its primary insurance provider, Continental Casualty Co., and later notified its three excess-policy carriers: National Union Fire Insurance Co., St. Paul Mercury Insurance Co. and Twin City Fire Insurance Co. When the insurance providers disputed coverage, Union Planters filed this diversity action, seeking to recover its losses, prejudgment interest and professional fees. Applying Tennessee law, the district court granted (1) Union Planters' motion for summary judgment against Continental Casualty and (2) the excess carriers' motions for summary judgment against Union Planters. We affirm.

I.

Mortgage bankers generate residential mortgages, which they frequently resell in the secondary market. When mortgage bankers lack sufficient capital to originate a residential mortgage, they often use warehouse lines of credit, which they obtain by offering as collateral the underlying mortgage instruments. Once the mortgage bankers sell the mortgages on the secondary market, they repay the warehouse lender, so that the commercial bank's collateral rotates continuously. Loans in the warehouse-lending industry may be "wet" or "dry": wet when the lender advances funds before it has in hand the original promissory note, mortgage and assignment of mortgage; dry when the lender advances funds only after it possesses these documents.

In November 1999, Union Planters extended a $10 million warehouse line of credit to Greatstone, a mortgage-banking company. Each time Greatstone needed to finance a new mortgage, Union Planters advanced the funds for the mortgage through a "wet" transaction: Greatstone would fax its loan-transfer requests to Union Planters; Union Planters would advance the funds to Greatstone; and Greatstone would send the collateral documentation to Union Planters.

In June 2000, Union Planters increased Greatstone's line of credit to $15 million; and in February 2001, Union Planters increased the line of credit to $25 million. Between November 1999 and July 2001, Greatstone borrowed approximately $165 million from Union Planters through these revolving credit transactions.

In August 2001, Greatstone stopped making payments to Union Planters and defaulted on the loans. Union Planters soon discovered that Greatstone was at the center of an elaborate bank fraud. Although Greatstone had generated many legitimate mortgages, it had done so in the end not for legitimate purposes but for the purpose of obtaining information from individual applicants, which it used to generate fraudulent mortgages by forging borrowers' signatures on new loan forms. Greatstone then split the mortgages, sending the real mortgages to one bank and the forged ones to another. All told, Greatstone received approximately $250 million from several banks by using forged mortgage loans to procure advances—much of which the principals of the company took with them when they fled to Costa Rica and became Costa Rican nationals, apparently beyond the reach of American law.

All of the mortgage loans that Greatstone provided to Union Planters as collateral, as it turned out, did not represent actual extensions of credit to the named borrowers. When Greatstone defaulted, Union Planters was left with worthless collateral (i.e. the forged promissory notes, mortgages and assignments of security interest) for $21,780,269 in advances and was left empty-handed for an additional $3,203,102 in advances.

Shorn of any hope of getting its money back from Greatstone, Union Planters turned to its insurance carriers. Union Planters maintained a primary insurance policy with Continental Casualty Co., one that provided the bank with coverage on a claims-made basis for certain types of losses—not to exceed $25 million—reported between June 1999 and June 2002. Two types of losses are relevant here: losses due to "forgeries," *see* Continental Policy § E.I.3.a, and losses due to "counterfeits," *see id*. § E.I.3.c.

In addition to its primary insurance policy, Union Planters purchased three additional layers of coverage from National Union Fire Insurance Co., St. Paul Mercury Insurance Co. and Twin City Fire Insurance Co. (collectively, the "excess carriers"). Each of these policies incorporated the terms and conditions of the Continental policy. And each policy provided Union Planters with a supplemental $25 million layer of coverage—bringing Union Planters' total insurance coverage to $100 million.

The policies established the following order of coverage: Continental covered losses from $0 to $25 million; National Union covered losses from $25 to $50 million; St. Paul covered losses from $50 to $75 million; and Twin City covered losses from $75 to $100 million. Each policy required Union Planters to notify the excess carriers of a claim at the same time it notified the primary carrier (Continental) of a claim.

In a letter dated September 20, 2001, Union Planters notified Continental about Greatstone's default and the bank's initial losses. After investigating the fraud and calculating its losses, Union Planters provided Continental with a detailed proof of loss on February 15, 2002. On March 12, 2002, Union Planters claims that its agent sent a letter to the excess carriers about the loss, though none of the carriers acknowledges receiving the letter. Continental repudiated Union Planters' claims for coverage.

On May 1, 2002, Union Planters filed a diversity suit under Tennessee law in federal district court seeking a "declaration of the rights and obligations of the parties under the various insurance policies" and "any funds it may be due under those policies." JA 920. All five parties moved for summary judgment. The district court (1) granted Union Planters' motion for summary judgment against Continental; (2) granted the excess carriers' motions for summary judgment against Union Planters; and (3) denied the remaining motions for summary judgment. The parties subsequently filed a number of post-judgment motions, which the district court resolved in June of 2005—by among other things denying Union Planters' requests for prejudgment interest and professional fees.

## II.

On appeal, Union Planters challenges the grant of summary judgment in favor of the excess carriers and the denial of its motions for prejudgment interest and professional fees, while Continental cross-appeals the grant of summary judgment in favor of Union Planters. "We give fresh review to a district court's summary-judgment decision, applying the same familiar standard that district courts apply." *Flaskamp v. Dearborn Pub. Schs.*, 385 F.3d 935, 940 (6th Cir. 2004).

## A.

The first item on the parties' agenda is whether the district court correctly determined that Union Planters was entitled to coverage under § E.I.3.a of the company's primary policy with Continental. That provision says:

> The Insurer shall indemnify the Union Planters Corporation Insureds
> for Loss resulting directly from a Union Planters Corporation Insured
> having in good faith:

> a. acted on an Original Financial Document which bears a Forgery or Alteration upon which the Union Planters Corporation Insureds relied;
>
> . . .
>
> Actual physical possession, and continued actual physical possession if taken as collateral, . . . is a condition precedent to the Union Planters Corporation Insured having acted in reliance upon the Financial Document.

JA 641–43. To establish coverage under this section, Union Planters must show that (1) in good faith (2) it acted on original financial documents that (3) contained a forgery upon which (4) the bank relied, and (5) that the losses "resulted directly" from the bank's reliance on the forgeries. The policy defines a "forgery" as "[t]he signing of the name of another person . . . without authority with intent to deceive," JA 654, and defines "reliance" as requiring "continued" "[a]ctual physical possession" of any collateral, JA 642-43.

Continental does not challenge Union Planters' good faith, the existence of original financial documents or the existence of forgeries on those documents. It argues that the bank fails to satisfy the other three requirements: (1) that it relied on the forged documents; (2) that it continually, actually and physically possessed forged documents; and (3) that its losses resulted directly from its reliance on the forgeries.

In one sense, it seems clear that Union Planters relied on the forgeries, continually possessed the forged collateral and incurred losses directly as a result of its reliance on the forged documents. The bank extended a revolving line of credit to Greatstone; as a condition of that line of credit, the bank required Greatstone to provide collateral; the bank maintained a pool of collateral—namely, the forged documents that it received from Greatstone—to secure the revolving line of credit; and there is no reason for doubting that the bank never would have extended this credit had it known that Greatstone could not tender legitimate collateral for the revolving line of credit.

Complicating the matter is the fact that the bank rarely, if ever, possessed the collateral for each new mortgage at the time it extended each new advance. That is because the bank was engaged in a "wet" warehouse line of credit by which each advance of funds preceded the receipt of new collateral for that advance. If we look at each loan transaction by itself, then, it might be said that Union Planters did not rely on each forged loan document before advancing funds because it advanced the money connected to each piece of collateral before it received the collateral. But the lending relationship between the bank and Greatstone does not permit us to look at each transaction by itself. It was a revolving line of credit, not a one-loan-at-a-time arrangement. And the very nature of a revolving line of credit is to permit the borrower to obtain access to the funds more promptly and, in the case of a "wet" warehouse line of credit, to obtain the funds first with the collateral immediately to follow—effectively permitting the last loan's collateral to back up the next loan's advance. It is a commonplace practice, and Continental has not argued otherwise. It also is an efficient practice because it saves the bank from having to attend each residential house closing before immediately releasing additional funds.

Nor does the policy by its terms preclude coverage under these circumstances. The policy says only that the bank must rely on the forged documents in advancing funds. It does not say that the bank's reliance has to relate only to funds connected to a particular piece of collateral; it thus does not exclude from coverage an entire category of revolving lines of credit—namely a "wet" warehouse line of credit.

Two rules for construing insurance contracts under Tennessee law cement this conclusion. "To exclude coverage, exclusion clauses must be drafted in clear and unambiguous terms." *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 367 (Tenn. 1973). And ambiguous terms in an insurance policy must be "construed against the insurer." *Id.* That this policy does not unambiguously exclude this form of reliance (or otherwise wholly exempt from coverage this commonplace form of residential-loan financing) and that Continental is the insurer (and drafter of the policy to boot) both support the district court's decision.

Once Union Planters' permissible reliance on the revolving collateral is established, there is little room for debate about the "continued actual physical possession" and "loss resulting directly from" requirements of the policy. The bank possessed the collateral until each loan had been paid. And the losses directly resulted from loans extended on the basis of a pool of forged collateral. *See White v. Methodist Hosp. South*, 844 S.W.2d 642, 648 (Tenn Ct. App. 1992) (defining "proximate cause" as "the procuring and efficient cause of the plaintiff's damage or injury . . . indicat[ing] nearness in causal relation" but not necessarily "the last act, the one nearest to the injury or damage, or the sole cause"); *Am. Nat'l Prop. & Gas Co. v. Gray*, 803 S.W.2d 693, 695 (Tenn. Ct. App. 1990) (noting that the definition of "direct cause" incorporates the overlapping concepts of "proximate cause" and "efficient cause").

Continental resists the conclusion that the losses resulted directly from the forgeries on the ground that the real cause was Union Planters' "commercially unreasonable" conduct, which included the bank's failures: to verify the information on the loans; to investigate Greatstone's credit; to inquire into the alleged property purchases; and to follow the procedures in its agreement with Greatstone. *See* Continental Br. at 48–53; Continental Reply Br. at 24–26. The problem with this argument, however, is that each of these allegations at most establishes negligence on Union Planters' part, and negligence will not suffice to defeat coverage. *See First Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co.*, 416 F.2d 52, 57 (5th Cir. 1969) ("Had negligence been intended as a good defense to payment . . . it should have been set out in the agreement."); *cf. Aschenbrenner v. U.S. Fid. & Guar. Co.*, 292 U.S. 80, 86 (1934). Consistent with this case law and consistent with the terms of the policy, Continental indeed concedes that negligence is not sufficient to defeat coverage. Continental Reply Br. at 24.

*Flagstar Bank, FSB v. Federal Insurance Co.*, No. 05-70950, 2006 WL 3343765 (E.D. Mich. Nov. 17, 2006), does not alter this conclusion. There, the district court held that the bank's acceptance of worthless collateral, not the presence of forged signatures, directly caused the losses and thus precluded coverage. *See id.* at *6, *12–13. But the collateral the bank received in that case was entirely fictitious: the named borrowers were never customers of the mortgage lender; no permanent lender ever purchased any of the mortgage loans; and even if the loans had borne legitimate signatures, they still would have been worthless. Here, by contrast, the named borrowers were customers of Greatstone; permanent lenders purchased some of the loans; and if the loans had borne legitimate signatures, they would have had value.

Continental next argues that Union Planters failed to mitigate its damages. But this is just a variation on its theme that the bank's alleged negligence should defeat coverage, which is not the case under Tennessee law. Here, Greatstone actively concealed its breach from Union Planters, and once the bank discovered the fraud it took appropriate action. Continental does not point to any cases that limit the bank's recovery under these circumstances, and several cases point in the opposite direction. *See Morgan, Olmstead, Kennedy & Gardner Inc. v. Schipa*, 585 F. Supp. 245, 248 (S.D. N.Y. 1984) (holding that the failure to mitigate defense was "insufficient as a matter of law" to the extent that it was "grounded upon plaintiff's negligent conduct"); *see also Willever v. Sovereign Bank*, 42 Pa. D. & C. 4th 562, 575 n.5 (Pa. Com. Pl. 1998) (rejecting defendant's failure-to-mitigate argument because the opportunities to mitigate were concealed from the plaintiff); *Sec. Nat. Bank v. Recreational Dimensions, Inc.*, 1991 Mass. App. Div. 21, 22 ("The defendants' failure

to discover the . . . breach of contract at an earlier date did not constitute a failure to mitigate damages once the breach was discovered.").

Continental next argues that, if Union Planters prevails, the bank should not be permitted to recover its final $2 million in losses. This argument, however, merely reprises the reliance argument: Because Union Planters never received any collateral for the final $2 million in advances, the argument goes, these losses do not qualify under the policy. So long as the policy permits coverage for a "wet" warehouse line of credit, as we conclude it does, the policy does not preclude the bank from obtaining coverage for these last $2 million in losses.

All of this goes to show why Union Planters' losses qualify as a matter of law under the coverage restrictions in § E.I.3.a of its primary policy. Union Planters therefore is entitled to summary judgment against Continental for the $24,983,371 in losses that it suffered due to Greatstone's fraud—less the nearly $12 million that Continental has already paid to Union Planters for non-Greatstone-related losses.

B.

The next issue is whether the district court properly granted the excess carriers' motions for summary judgment rejecting Union Planters' claims against them as a matter of law. Each of the excess carriers' supplemental insurance policies included a provision requiring "simultaneous notice" of any claim made under the primary coverage policy. *See* JA 692 (National Union); *see also* JA 696 (St. Paul), JA 980e (Twin City). The district court held that Union Planters did not satisfy this requirement, and we agree.

The "simultaneous notice" provision of the National Union policy is representative. It reads in relevant part:

> [Union Planters] shall, as a condition precedent to the right to receive coverage under this policy, give written notice to[] [National Union] *simultaneously* with any notice given under . . . the primary policy.

JA 692 (emphasis added). Under this provision, whenever Union Planters gave Continental "any notice" of a claim under the primary policy, it had to give National Union simultaneous, written notice "as a condition precedent . . . to receive coverage." Tennessee law does not give courts latitude to excuse compliance with notice provisions in insurance policies. *Pope v. Leuty & Heath, PLLC*, 87 S.W.3d 89, 94–95 (Tenn. Ct. App. 2002); *see also Blackman v. U.S. Cas. Co.*, 103 S.W. 784, 786 (Tenn. 1906).

Viewing the facts in the light most favorable to Union Planters, it provided notice to Continental on February 15, 2002. By its own admission, Union Planters provided written notice to National Union in a letter dated March 12, 2002—25 days after it notified Continental. We agree with the district court that, whatever simultaneous notice means, it does not mean a 25-day delay. *See* D. Ct. Op. at 20.

Union Planters contends that we should excuse non-compliance with the notice requirement because no one was prejudiced by the delay. In making this argument, the bank relies on *Alcazar v. Hayes*, 982 S.W.2d 845, 856 (Tenn. 1998), which created an exception to the general rule that insurance-policy notice provisions should be strictly enforced. *See Blackman*, 103 S.W. at 786. *Alcazar* held that an insured's failure to provide notice gives rise to a "rebuttable presumption" of prejudice, one that may be rebutted by "competent evidence that the insurer was not prejudiced by the insured's delay." 982 S.W.2d at 856.

*Alcazar*, however, does not announce an across-the-board exception to the general rule—either by its terms or by its rationale. The case arose in the context of an occurrence-based policy. Such policies, the court observed, frequently amount to "contract[s] of adhesion," and enforcement of the rule in that setting would produce an "undeserved windfall" for insurers. *Id*. at 851 (internal quotation marks omitted). Consistent with this rationale, the Tennessee courts have limited the application of this exception to occurrence-based policies. *See Pope*, 87 S.W.3d at 94–95 ("[O]ur Supreme Court has never applied the rationale of *Alcazar* to a claims-made policy."); *cf. Am. Justice Ins. Reciprocal v. Hutchinson*, 15 S.W.3d 811, 816–17 (Tenn. 2000) (applying the *Alcazar* exception to cover an occurrence-based policy on the reasoning that the industry's policies were also contracts of adhesion).

In this instance, the contracts were entered into by sophisticated parties, and there is no evidence that Union Planters was prevented from negotiating this provision or any other with the excess carriers. The policies, moreover, amount either to claims-based policies ("This is a claims reported policy," the primary policy says, JA 51) or to quasi-claims-based policies, both of which place a premium on notice and discovery because they "appl[y]" only "to claims *reported* during the Policy Period," JA 62 (emphasis added). In either event, they are not occurrence-based policies, which require only the root of the claim to *occur* during the life of the policy.

Union Planters also has not offered a good explanation for certifying this question to the Tennessee Supreme Court. Union Planters of course chose to bring this case in a federal rather than a state forum in the first instance, and it did not raise the issue of certification until the federal district court had ruled against it on this point. Nor do we face a situation in which there is an absence of guidance from the Tennessee courts on the *Alcazar* question. As we have shown, the Tennessee lower court decisions since *Alcazar* do not support the bank's interpretation, the Tennessee Supreme Court's decisions since *Alcazar* imply that *Alcazar* did not create an across-the-board exception to compliance with the notice requirements in an insurance policy and the underlying rationale of *Alcazar* does not extend to claims-based policies. Under these circumstances, we favor resolving this issue of Tennessee law just as the bank initially presumed we would when it filed this action and just as it presumed the district court would when it filed its summary judgment papers.

C.

Tennessee law permits courts to award prejudgment interest "as permitted by the statutory and common laws of the state . . . in accordance with the principles of equity." Tenn. Code Ann. § 47-14-123. While some States make such awards mandatory, *see, e.g.*, *Hi-Mill Mfg. Co. v. Aetna Cas. & Sur. Co.*, 884 F. Supp. 1109, 1112 (E.D. Mich. 1995), Tennessee commits them to the discretion of trial judges, *see Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The primary insurance policy defines "loss" as the "loss of funds or property owned by [Union Planters], but *not loss of use* of funds or property." JA 655 (emphasis added). As the district court observed, an award of prejudgment interest is one that compensates a deserving party for "loss of the use" of its funds—precisely the sort of loss excluded by the plain language of the policy. The district court considered this policy language, weighed the equities and refrained from awarding prejudgment interest. Because the trial court permissibly exercised its discretion, we will not second guess its judgment on this score.

One final point. We need not reach Union Planters' claim for professional fees and expenses under the policy. In view of our conclusion that the excess carriers are not liable and in view of the fact that Union Planters' existing losses will exhaust the limit of the Continental policy, Union Planters could not collect any award of such expenses and fees.

III.

For these reasons, we affirm.